2004 OK CR 27

**Ronald Clinton LOTT, Appellant**

v.

**STATE of Oklahoma, Appellee.**

No. D–2002–88.

Court of Criminal Appeals of Oklahoma.

Sept. 9, 2004.

Craig Corgan, Wayna Tyner, Perry Hudson, Indigent Defense System, Norman, OK, John Albert, Oklahoma City, OK, counsel for appellant at trial.

Wesley Lane, District Attorney, Richard Wintory, Greg Mashburn, Assistant District Attorneys, Oklahoma City, OK, counsel for the State at trial.

Gretchen Garner Mosley, Traci J. Quick, Indigent Defense System, Sapulpa, OK, counsel for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, David M. Brockman, Robert Whittaker, Assistant Attorneys General, Oklahoma City, OK, counsel for the State.

## OPINION

LUMPKIN, Judge.

¶ 1 Appellant Ronald Clinton Lott was tried by jury and convicted of two counts of First Degree Murder (21 O.S.Supp.1985, § 701.7), Case No. CF–87–963, in the District Court of Oklahoma County. The jury found the existence of two aggravating circum-

stances in each count and recommended the punishment of death for each count. The trial court sentenced accordingly. From this judgment and sentence Appellant has perfected this appeal.[1]

¶2 Sometime after 10:30 p.m., September 2, 1986, Anna Laura Fowler was attacked in her home, raped and murdered. Mrs. Fowler was 83 years old and lived alone. As a result of the attack, Mrs. Fowler suffered severe contusions on her face, arms and legs, and multiple rib fractures. She died from asphyxiation.

¶3 Zelma Cutler lived across the street from Mrs. Fowler. Mrs. Cutler was 93 years old and lived alone. During the early morning hours of January 11, 1987, Mrs. Cutler was attacked, raped and murdered in her home. Mrs. Cutler suffered severe contusions on her arms and legs as a result of the attack. She also suffered multiple rib fractures. Mrs. Cutler died from asphyxiation.

¶4 Robert Miller was arrested, charged, and ultimately convicted of the rapes and murders of Mrs. Fowler and Mrs. Cutler. Subsequent to Miller's arrest, Grace Marshall was attacked and raped in her home on March 22, 1987. Eleanor Hoster was attacked and raped in her home on May 7, 1987. Both Mrs. Marshall and Mrs. Hoster were elderly ladies who lived alone. With the exception that Mrs. Marshall and Mrs. Hoster were not killed after being raped, there were striking similarities between the attacks on the four women. Appellant was arrested, charged, and ultimately plead guilty to committing the rapes against Mrs. Marshall and Mrs. Hoster.

¶5 In approximately 1992, during Robert Miller's appeal period, Miller was excluded as the source of semen in the Fowler/Cutler cases through DNA testing. DNA testing subsequently implicated Appellant as the source of the semen. While Appellant was incarcerated for the Marshall/Hoster crimes, he was charged with two counts of malice aforethought murder or in the alternative first degree felony murder for the murders of Mrs. Fowler and Mrs. Cutler.

### PRE-TRIAL ISSUES

■ ¶6 In his first assignment of error, Appellant contends the trial court erred in refusing to dismiss the charges based upon the denial of his constitutional rights to a speedy trial under the Sixth Amendment to the United States Constitution and Article II, §§ 6 and 20 of Oklahoma's Constitution.[2]

■ ¶7 When reviewing a claim of the denial of the constitutional right to a speedy trial, we apply the four balancing factors established by the United States Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972):(1) length of the delay; (2) reason for the delay; (3) the defendant's assertion of his right, and (4) prejudice to the defendant. These are not absolute factors, but are balanced with other relevant circumstances in making a determination. *See Rainey v. State,* 1988 OK CR 65, ¶3, 755 P.2d 89, 90. Appellant claims all four factors clearly weigh in his favor and that his speedy trial right has been unquestionably denied.

¶8 Regarding the length of delay, Appellant was originally charged on March 10, 1995, by amended information, with the com-

1. Appellant's Petition in Error was filed in this Court on July 17, 2002. Appellant's brief was filed September 5, 2003. The State's brief was filed January 5, 2004. The case was submitted to the Court January 13, 2004. Appellant's reply brief was filed January 26, 2004. Oral argument was held June 8, 2004.

2. The speedy trial provision of the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district where the crime shall have been committed....". Similarly, Section 20 of the Oklahoma Constitution states, in part, "In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed....". Section 6 of the Oklahoma Constitution reinforces the importance of this constitutional right by stating, "The courts of justice of the State shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay, or prejudice." Oklahoma does not have a speedy trial act which sets forth a specific period of time for a matter to be brought to trial. *But see* Uniform Criminal Extradition Act, 22 O.S.1991, § 1347.

mission of the Fowler/Cutler murders. On January 30, 1996, those charges were dismissed by the State with the intent to refile at a later date. At that time, Appellant was incarcerated for the Marshall/Hoster rapes. Appellant argues the ten months between the filing and dismissal of the original charges should be counted in considering the length of delay factor. In *United States v. MacDonald*, 456 U.S. 1, 8, 102 S.Ct. 1497, 1502, 71 L.Ed.2d 696 (1982), the United States Supreme Court held that "once charges are dismissed, the speedy trial guarantee is no longer applicable." Appellant's reliance on *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967) is misplaced. In *Klopfer*, the prosecutor was able to suspend proceedings indefinitely; the charges were not dismissed. *Id.*, at 214, 87 S.Ct. at 989. In the present case, Appellant was incarcerated for a separate crime at the time, therefore no due process violation occurred. *See MacDonald*, 456 U.S. at 8, 102 S.Ct. at 1502.

¶ 9 Charges against Appellant for the Fowler/Cutler murders were refiled by a Third Amended Felony Information on March 19, 1997. The trial began December 3, 2001. Therefore the length of delay was approximately 4 years and 10 months.[3] This was a substantial delay and is sufficient, under our case law, to necessitate a review of the other three factors. *See Ellis v. State*, 2003 OK CR 18, ¶ 30, 76 P.3d 1131, 1136.[4]

¶ 10 We next consider the second factor, the reason for the delay. *Barker v. Wingo* speaks of a "valid reason" for the delay. However, our statute speaks of "appropriateness of the cause of the delay," while the former statute spoke of "good cause."[5] All of these phrases have essentially the same meaning and require the reviewing court to ascertain what is causing the delay and then to ask if the cause is reasonable. *Id.* Further,

> *Barker v. Wingo* recognized that the second factor depends on the circumstances of the case. Deliberate delay weighs heavily against the government. Neutral reasons, like negligence or crowded courts, weigh slightly in a defendant's favor, for "ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Barker v. Wingo*, 407 U.S. at 531, 92 S.Ct. at 2192. And a "valid reason, such as a missing witness, should serve to justify appropriate delay." *Id.*

*Ellis*, 2003 OK CR 18, ¶ 47–48, 76 P.3d at 1139 (footnote omitted).

¶ 11 Appellant's case was set for trial to begin on May 22, 2000. This date was stricken at the request of the defense in order to allow Appellant to produce evidence in support of a Motion to Dismiss for Speedy Trial. A hearing was held on Appellant's motion on May 26, 2000. On June 2, 2000, the trial

---

3. An earlier jury trial was begun October 29, 2001. In the middle of trial, the State requested a continuance when the medical examiner revealed he had evidence in his possession that had never been tested. The State requested the continuance so LabCorp could test the newly discovered evidence. The defense requested a mistrial. The State agreed to the mistrial if the defense would agree to stipulate to a continuance and stipulate to the chain of custody. The mistrial was granted and the trial rescheduled for December 3, 2001. Appellant waived his right to a speedy trial as to the December trial date.

4. In *Ellis*, we cited to 22 O.S.Supp.1999, § 812.1, which indicates our Legislature considers any delay beyond one-year to require special review by the District Court. We further noted that even under the former statute, § 812, we have generally regarded the twelve-month interval as a threshold period of time in the speedy trial inquiry.

5. 22 O.S.Supp.1999, § 812.1(A), provides in pertinent part, "[I]f any person charged with a crime and held in jail solely by reason thereof is not brought to trial within one (1) year after arrest, the court shall set the case for immediate review as provided in Section 2 of this act, to determine if the right of the accused to a speedy trial is being protected." This provision was enacted in 1999 and became effective on November 1, 1999. However, it is basically an amendment to sections 811 and 812, which have been the law since 1910, but were repealed when the new version was enacted.

22 O.S.1991, § 812, repealed in 1999. provided, "[I]f a defendant prosecuted for a public offense, whose application, is not brought to trial at the next term of court in which the indictment or information is triable after it is filed, the court must order the prosecution to be dismissed, unless good cause is shown."

court denied the motion to dismiss and issued a detailed Findings of Fact and Conclusions of Law. *See Appendix.*

¶ 12 In its Findings of Fact and Conclusions of Law, the trial court found several reasons for the delay. The court also stated that the delay was not solely attributable to the State. The preliminary hearing began 8 months after charges had been refiled. It was continued on six different dates until it was completed March 20, 1998. The trial court found that at no time during the course of the hearing did the defense raise an objection to the lengthy nature of the hearing. Under our review of the voluminous record, we cannot dispute that claim. At the conclusion of the hearing, Appellant requested immediate receipt of the preliminary hearing transcripts at public expense. The record reflects a delay of approximately six months, with the final transcript filed in September 1998. The trial court found that defense counsel's request for a completed transcript was reasonable as the evidence presented at the preliminary hearing was relevant to the court's pre-trial rulings.

¶ 13 In a Supplemental Brief, Appellant challenges the trial court's finding that this delay was due to the preparation of preliminary hearing transcripts. Appellant asserts trial counsel never requested a continuance based on the lack of transcripts. Even if counsel did not request a continuance on this basis, we find the trial court's ruling that such transcripts were necessary and relevant for pre-trial rulings to be reasonable.

¶ 14 Appellant argues the delay from preliminary hearing to pre-trial was due instead to the fact that the assigned judge, Judge Owens, was retiring in January 1999 and simply did not want to try the case. Appellant relies on *Ellis* where we stated, "[u]nder the statute, it is clearly the trial judge's responsibility to manage his or her docket in such a way that ensures the right

to speedy trial is being protected". 2003 OK CR 18, ¶ 50, 76 P.3d at 1139.

¶ 15 In this regard, the trial court found the case was delayed due to scheduling conflicts of both court and counsel. The trial court found that the docket of Judge Owens was such that he could not have tried a case of this magnitude during the four month time period encompassing the final completion of the preliminary hearing transcript and the date of his retirement. The trial court noted that Judge Owens chose not to hear any pre-trial motions in this case as he would not be the presiding judge at trial. The trial court found no defense request for trial during the time the case was pending before Judge Owens.

¶ 16 Section 812.2(A)(2)(g) and (i) require the court to look at whether the delay occurred because "the court has other cases pending for trial that are for persons incarcerated prior to the case in question, and the court does not have sufficient time to commence the trial of the case within the time limitation fixed for trial," and "the court, state, accused, or the attorney for the accused is incapable of proceeding to trial due to illness or other reason and it is unreasonable to reassign the case." While we do not know from the record whether Judge Owens had other cases pending for trial that were for persons incarcerated longer than Appellant, we do have the trial court's finding that Judge Owens' docket was such that he could not try a case of this complexity prior to his retirement. While these delays appear to be a deliberate postponement of the case, taking judicial notice of the large caseload of criminal cases in the District Court of Oklahoma County, and the complex nature of the present case, we do not dispute the trial court's finding that the delay pending Judge Owens' retirement was reasonable.[6] Therefore, this delay does not weigh in Appellant's favor.

6. Appellant argues the case was passed four times while assigned to Judge Owens without Appellant's or defense counsel's knowledge, appearance or consent. Appellant states in his brief that each time counsel appeared, he would be informed that the case had been passed and Judge Owens would not meet with him. Appellant contends that finally defense counsel complained and was told by the bailiff that Judge Owens did not intend to do anything on the case because he was retiring in 1999. The record does not support Appellant's allegations, although we recognize the difficulty in proving such claims. If in fact, Appellant's claims are true that he was not able to meet with the judge and informed by a third party that the judge did

¶ 17 In February 1999, the case was reassigned to Judge Bragg. However, she shortly thereafter recused herself from the case. The case was assigned to Judge Black on March 1, 1999, and pre-trial hearings were commenced. However, it would be another two years and seven months before trial would begin. The trial court found this was due to the change in defense counsel (three attorneys from the Oklahoma Indigent Defense System since preliminary hearing), and scheduling conflicts of all parties concerned. As a result of the scheduling conflicts, the trial court convened a three-judge panel to resolve the conflicts and schedule major cases involving the attorneys in Appellant's case. Appellant's case was set for trial on March 27, 2000. While Appellant criticizes the convening of this three-judge panel, he does not offer an alternative solution to resolving the scheduling conflicts between court and counsel. We find the trial court acted responsibly in convening the panel in order to resolve the conflicts and expedite Appellant's case.

¶ 18 Trial did not begin on March 27, 2000, but was delayed due to requests for continuance from the State for additional time for forensic analysis, the postponement of scheduled testing by LabCorp so the defense could have an expert present during testing, and Appellant's Motion to Dismiss for lack of a Speedy Trial. In its order denying the motion to dismiss, the trial court stated that the State and the court could have tried the case in May or June 2000, but at the request of the defense, proceedings were stayed pending resolution of the motion. The motion to dismiss was denied June 2, 2000, and trial was rescheduled to November 13, 2000, to allow Appellant to seek extraordinary relief with this Court. On July 3, 2000, Appellant appealed to this Court from the District Court's order denying his motion to dismiss for lack of speedy trial. On August 17, 2000, this Court declined jurisdiction and dismissed the appeal. This mandamus action does not weigh in Appellant's favor as it was

ultimately unsuccessful and caused a further delay of eight months. However, "by the same token, we recognize a mandamus action is not the same as an interlocutory appeal and the remedy was sought, at least in part, to protect his speedy trial endeavors." *Ellis*, 2003 OK CR 18, ¶ 56, 76 P.3d at 1140, *citing United States v. Loud Hawk*, 474 U.S. 302, 316, 106 S.Ct. 648, 656, 88 L.Ed.2d 640 (1986)(finding delay attributable to defendant's interlocutory appeal "ordinarily will not weigh in favor of a defendant's speedy trial claims.")

¶ 19 The record reflects that from the November 2000 trial date, trial was rescheduled approximately three times (March 26, 2001; September 10, 2001; and October 29, 2001). These delays were the result of additional forensic testing. Appellant argues this delay was a "concerted effort on the part of the State and the trial court to allow the State to continue to investigate and strengthening (sic) its case". To the contrary, the record reflects an effort by the trial court to ensure the parties had all necessary evidence before proceeding to trial.

¶ 20 The record reflects that certain delays from the November 2000 trial date to October 2001 when the first trial began were the result of the State failing to timely comply with the Discovery Code. The trial courts are empowered to order the appropriate relief for the failure to comply with a discovery order. 22 O.S.Supp.1996, § 2002(E)(2). Although the continuances resulted in further delay, the trial court did not abuse its discretion in granting the continuances as it gave the defense time to investigate evidence recently turned over by the State. Further, considering the recent availability of the new mitochondrial analysis of DNA evidence during the pendency of the proceedings, the continuances for additional forensic testing were reasonable and prudent.

¶ 21 In March 2001 an issue arose as to the involvement of Joyce Gilchrist, forensic chemist with the Oklahoma City Police De-

---

not intend to act on the case pending his retirement, it was defense counsel's responsibility to request reassignment of the case to a different judge. There is no evidence of such in this case. However, we also note that as part of properly

managing their caseload, judges who find it impossible to complete a case before retirement, should seek to reassign the case as soon as possible.

partment and potential witness in the case. Prior to selecting a jury for the start of trial on March 26, 2001, the trial court held an *in-camera* hearing on the matter. It was revealed that there was an ongoing internal review within the police department of Ms. Gilchrist's work. The defense indicated to the court that it would be ineffective in announcing ready for trial at that time without further information on the Gilchrist matter; however, the defense did not want a continuance based upon the speedy trial claim. As a third alternative, the defense moved for a dismissal of the case.

¶ 22 The trial court denied the motion to dismiss, and with a jury waiting to be selected, informed the defense it had to choose between going forward with trial or continuing the case. After giving defense counsel time to consult with Appellant, defense counsel announced that based upon the need for additional investigation that could lead to exculpatory evidence, a continuance was requested. However, the defense did not want to relinquish its claim to a speedy trial. The State objected to the continuance and argued Appellant could not assert a speedy trial claim and request a continuance. The State argued Ms. Gilchrist had minimal involvement in this case and was not the sole tester of the evidence. The State also argued the defense had been aware for some time prior to the start of trial of Ms. Gilchrist's involvement in the case and the controversy surrounding her work.

¶ 23 Noting the presence of victims in the courtroom waiting for the start of trial, potential jurors waiting outside the courtroom for the start of *voir dire*, the State's announcement of ready for trial, the court's own ability to try the case that day, and the court's misgivings about the necessity of a continuance based upon the Gilchrist matter, the trial court informed defense counsel he would have to choose between a request for a continuance and exercise of his speedy trial claim. The court informed Appellant that if he requested the continuance, he would have to waive the speedy trial claim. Appellant chose the continuance and jury trial was rescheduled to September 10, 2001. On August 30, 2001, the trial court convened a hearing to inform the parties that due to another jury trial, Appellant's trial would not proceed on September 10, 2001. Appellant objected on speedy trial grounds. The court noted that due to its heavy caseload, the earliest it could try the case would be October 29, 2001.

¶ 24 We agree with the trial court's finding that the delay in this case was not solely attributable to the State. The State, the defense, and the court can all be held accountable for delays in this case. However, on the record, the majority of the delays were for good cause and not deliberate attempts to slow the process by either party. Considering the complexity of this case, the discovery of the availability of the new mitochondrial analysis of DNA evidence during the pendency of the proceedings, the majority of the delays were necessary to further the ends of justice and ensure that Appellant received a fair and impartial trial. *See McDuffie v. State,* 1982 OK CR 150, ¶ 7, 651 P.2d 1055, 1056.

¶ 25 As for the third factor, assertion of the right by the accused, incarceration makes the demand for one in custody. *See McDuffie,* 1982 OK CR 150, ¶ 8, 651 P.2d at 1056. Additionally, Appellant made an affirmative request for a speedy trial on at least nine different occasions. As we noted in *Ellis,* 2003 OK CR 18, ¶ 45, 76 P.3d at 1139, "the defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right" (quoting *Barker,* 407 U.S. at 531–32, 92 S.Ct. at 2192–93). The third factor weighs in Appellant's favor.

¶ 26 Our fourth and final consideration concerns the prejudice, if any, worked upon Appellant from the delays in this case. In *Ellis,* this Court stated:

Both parties correctly noted that the United States Supreme Court has held that an affirmative demonstration of prejudice is not a prerequisite to a claim of denial of the right to speedy trial and that prejudice is not limited to detriment to the defense of the accused. *Moore v. Arizona,* 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973). Nevertheless, prejudice is one of the factors that must be considered, and

*Barker v. Wingo* outlined three types: oppressive pretrial incarceration; anxiety and concern of the accused; and impairment of the defense. Of these factors, the Supreme Court considers the third the most serious "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker v. Wingo,* 407 U.S. at 532, 92 S.Ct at 2193; *but see Doggett [v. U.S.],* 505 U.S. at 661–65, 112 S.Ct. at 2695–96, [120 L.Ed.2d 520] (Thomas, dissenting) (noting *Barker's* suggestion that preventing prejudice to the defense is a fundamental objective of the speedy trial clause is "plainly dictum" and contradicted by holdings of other cases).

2003 OK CR 18, ¶ 58, 76 P.3d at 1140–1141.

¶ 27 Appellant argues prejudice is evident because had his case gone to trial as mandated by 22 O.S.1991, § 812, in effect at the time of the first trial setting, the State's evidence would have consisted of DNA evidence by Brian Wraxall only. Wraxall testified at trial that his analysis of the evidence showed Appellant's DNA was consistent with all nine markers in the best samples taken from the crime scenes and was sufficient for him to identify Appellant as the source of the semen. This was the evidence the State had at preliminary hearing. Appellant asserts he would have challenged Wraxall's credibility and expertise based on extensive impeachment material available to the defense. However, due to the delays in the case, the State was able to present testimony from Megan Clement of LabCorp who testified that a sperm fraction of a vaginal swab taken from Mrs. Fowler was tested and a profile in 13 different areas of DNA obtained. Ms. Clement testified that the random match probability that Appellant was the donor of the sperm found in the vaginal swab was 1 in 15.7 quadrillion. At trial, Wraxall offered no such statistical probabilities, and the defense did not impeach him because Ms. Clement's testimony was more damaging.

¶ 28 The delays in the trial did not prevent Appellant from challenging the expertise and credibility of any of the experts conducting the DNA analysis. Further, the science of DNA testing is rapidly progressing and it was to the benefit of both the State and the defense to have the evidence subjected to the latest and most accurate type of analysis. Such testing could have very easily been exculpatory and therefore benefited Appellant. The fact that the results proved favorable to the State and not Appellant is not grounds upon which to base a finding of prejudice. This case is distinguishable from *Ellis,* in that the delays in *Ellis* were based upon the State's search for evidence against the defendant. In the present case, all of the evidence had been gathered, no new evidence was sought. It was merely a question of analyzing that evidence in the most accurate method possible. We find Appellant was not prejudiced by the delays as his defense was not hindered or impaired.

¶ 29 Appellant further argues the delay in not only going to trial but in charging him created significant difficulties for the defense in obtaining mitigation records and locating mitigating witnesses. Appellant asserts that with fourteen years having passed between the first homicide and trial, he was unable to obtain important evidence such as juvenile records, hospital records, and contact with friends and family that would have been helpful to a jury in determining his punishment. Initially, we do not review this claim of prejudice based upon a lapse of fourteen years, as Appellant did not even become a suspect until six years after the commission of the first murder. Further, Appellant has failed to demonstrate any prejudice. His argument in this regard is fully set forth above. Without further development of the argument, this Court is unable to review the claim.

¶ 30 As for *Barker's* other factors of prejudice, oppressive pretrial incarceration and anxiety and concern of the accused, Appellant makes no argument. However, we note that by 2000, Appellant had discharged the two 25 year sentences received in the Marshall/Hoster cases and was incarcerated solely on the charges in this case. While Appellant suffered some prejudice as a result of the deprivation of his liberty, this is not sufficient to tip the scales in Appellant's favor. The fourth factor weighs in the State's favor.

¶ 31 In summary, we find the first and third speedy trial factors weigh in Appellant's favor, but reasons for the delay and prejudice favor the State. After careful consideration, we find Appellant was not deprived of his speedy trial rights under the federal and state constitutions, based upon the finding of reasonable reasons for the delay, the absence of significant prejudice, and the less-than egregious deprivation of liberty.

¶ 32 Appellant further asserts the failure to dismiss his prosecution violated 22 O.S.1991, § 812 and 22 O.S.Supp.1999, §§ 812.1 and 812.2. Appellant argues that when charges were refiled in March 1997, he was not brought to trial "at the next term of court" pursuant to 22 O.S.1991, § 812, the statute in effect at the time.[7] However, as Appellant notes, the prosecution need not be dismissed in such a case when "good cause" has been shown for the delay. As discussed above, the complexities of this case, including the use of DNA analysis, the assigned judge's pending retirement, plus the extraordinarily long preliminary hearing provided sufficient good cause for the delay of the case past the "next term of court." Therefore, the failure to dismiss the prosecution in the fall of 1998 was not a statutory violation. Further, any violation of the 1999 enactment of §§ 812.1 and 812.2 was harmless under the facts of this case. *See Simpson v. State,* 1994 OK CR 40, ¶ 34, 876 P.2d 690, 701–02. Accordingly, this assignment of error is denied.[8]

¶ 33 In his second assignment of error, Appellant contends the trial court erred in refusing to sever the two murder charges and try him separately for each offense. An objection to the joinder of offenses was filed by the defense on October 25, 2000. On November 6, 2000, the trial court heard argument and denied the motion to sever. Therefore, the issue has been properly preserved for appellate review.

¶ 34 Joinder of offenses is permitted pursuant to 22 O.S.2001, § 438. This section provides that multiple offenses may be combined for trial "if the offenses ... could have been joined in a single indictment or information." This Court has allowed joinder of separately punishable offenses allegedly committed by the accused if the separate offenses "rise out of one criminal act or transaction, or are part of a series of criminal acts or transactions." *Glass v. State,* 1985 OK CR 65, ¶ 8, 701 P.2d 765, 768. "Further, with respect to a series of criminal acts or transactions, 'joinder of offenses is proper where the counts so joined refer to the same type of offenses occurring over a relatively short period of time, in approximately the same location, and proof as to each transaction overlaps so as to evidence a common scheme or plan.'" *Cummings v. State,* 1998 OK CR 45, ¶ 15, 968 P.2d 821, 829, *cert. denied,* 526 U.S. 1162, 119 S.Ct. 2054, 144 L.Ed.2d 220 (1999). *See also Glass,* 1985 OK CR 65, ¶ 8, 701 P.2d at 768.

¶ 35 Appellant admits that the first of the four factors discussed in *Glass* and *Cummings* was established, as the charges stemming from the first offense, first degree rape and first degree murder and in the alternative felony murder, were identical to the charges from the second offense. Appellant also states, "it is less clear but still likely that the requirements of proximity in time and

---

7. The phrase "term of court" as used in 22 O.S.1991, § 812 and elsewhere throughout our state laws, *i.e.* 12 O.S.1991, §§ 32.1, 55, 663–666, and 1451, refers to statutory provisions setting forth specific time periods during the year in which jury trials could be conducted in courts of this State. *See* 20 O.S. §§ 92, 95, 96.1, 96.2, 141–161. These provisions have been repealed (variously in 1941, 1968 and 1969). As a result, the dates in which court may conducted, and jury trials held, is not restricted by statute but is within the discretion of the District Courts. Therefore, the phrase "term of court" does not have the same meaning in today's judicial system as it once did.

8. Appellant also argues he was denied his rights to be free from the arbitrary imposition of the death penalty under the Eighth Amendment, 21 O.S.1991, § 701.10, and 21 O.S.Supp.1985, § 701.13(C). Appellant contends the State relied on first stage evidence obtained in violation of his federal and state constitutional rights to a speedy trial to support the alleged aggravating circumstances. However, this Court has found the first stage evidence was not unconstitutionally obtained. Therefore Appellant's claim is without merit.

space were also satisfied." The record supports Appellant's grudging admission of the satisfaction of the time and space requirements listed as the second and third factors for consideration. Mrs. Fowler and Mrs. Cutler lived across the street from each other and were killed within a four month time period.

¶ 36 Appellant does not concede the fourth factor, that the proof as to each transaction overlaps so as to evidence a common scheme or plan, was established. We disagree. Both crimes were committed against elderly ladies who lived alone. Both victims had friends or family who visited them, but otherwise they had set routines, and rarely left their homes. In contrast to other houses in the neighborhood, the victims' homes and yards were noticeably well taken care of. In each case, entry into the house was made under cover of darkness, either late at night or very early in the morning. Entry in each case was a break-in through a rear door to the residence. In each case, cuts had been made in the rear screen door. Both victims were beaten, raped, and asphyxiated in their beds. A knotted rag was found near each body. In each case, the rapes appeared to be the primary purpose for the break-ins as the houses were not ransacked and nothing of value was taken from the homes. In each instance, Appellant had a relative who lived nearby. This evidence is sufficient to find that proof of each offense overlapped so as to evidence a common scheme or plan, and therefore allow for joinder of the offenses for trial. *See Gilson v. State,* 2000 OK CR 14, ¶ 48, 8 P.3d 883, 904–905, *cert. denied,* 532 U.S. 962, 121 S.Ct. 1496, 149 L.Ed.2d 381 (2001). *See also Pack v. State,* 1991 OK CR 109, ¶ 8, 819 P.2d 280, 283.

¶ 37 Further, Appellant has failed to show any prejudice resulting from the joinder. Evidence of either offense would have been admissible in a trial of the other pursuant to 12 O.S.1991, § 2404(B) as evidence of other crimes or wrongs to prove motive, intent, or common scheme or plan. *See Myers v. State,* 2000 OK CR 25, ¶¶ 19–24, 17 P.3d 1021, 1029–30, *cert. denied,* 534 U.S. 900, 122 S.Ct. 228, 151 L.Ed.2d 163 (2001). Accordingly, we find no abuse of discretion by the trial court denying the motion to sever. *See Gilson,* 2000 OK CR 14, ¶ 49, 8 P.3d at 905. This assignment of error is denied.

### FIRST STAGE ISSUES

¶ 38 Appellant contends the trial court erred in admitting evidence of the sexual assaults on Mrs. Marshall and Mrs. Hoster. Appellant relies on prior case law from this Court where we have stated that "similarity between crimes, without more, is insufficient to permit admission" of evidence of other crimes. *See Hall v. State,* 1980 OK CR 64, ¶ 5, 615 P.2d 1020, 1022.

¶ 39 Prior to trial, the State filed a *Notice of Intent to Use Evidence of Other Crimes and Brief in Support.* The State alleged the similarities between the Fowler/Cutler homicides and the Marshall/Hoster assaults were "relevant as an aid in determining the identity of the assailant. Also, the evidence is admissible as being part of a common scheme or plan since it demonstrates a highly distinct method of operation." The State cited 37 similarities between the Fowler/Cutler crimes and the Marshall/Hoster crimes. After hearing argument, the trial found the other crimes evidence to be relevant and admissible.

¶ 40 The basic law is well established—when one is put on trial, one is to be convicted—if at all—by evidence which shows one guilty of the offense charged; and proof that one is guilty of other offenses not connected with that for which one is on trial must be excluded. *Burks v. State,* 1979 OK CR 10, ¶ 2, 594 P.2d 771, 772, *overruled in part on other grounds, Jones v. State,* 1989 OK CR 7, 772 P.2d 922. *See also Hall v. State,* 1985 OK CR 38, ¶ 21, 698 P.2d 33, 37. However, evidence of other crimes is admissible where it tends to establish absence of mistake or accident, common scheme or plan, motive, opportunity, intent, preparation, knowledge and identity. *Burks,* 1979 OK CR 10, ¶ 2, 594 P.2d at 772. To be admissible, evidence of other crimes must be probative of a disputed issue of the crime charged, there must be a visible connection between the crimes, evidence of the other crime(s) must be necessary to support the State's burden of proof, proof of the other crime(s)

must be clear and convincing, the probative value of the evidence must outweigh the prejudice to the accused and the trial court must issue contemporaneous and final limiting instructions. *Welch v. State,* 2000 OK CR 8, ¶ 8, 2 P.3d 356, 365, *cert. denied,* 531 U.S. 1056, 121 S.Ct. 665, 148 L.Ed.2d 567 (2000).

■■■■ ¶ 41 When other crimes evidence is so prejudicial it denies a defendant his right to be tried only for the offense charged, or where its minimal relevancy suggests the possibility the evidence is being offered to show a defendant is acting in conformity with his true character, the evidence should be suppressed. *Id.* Where, as here, the claim was properly preserved, the State must show on appeal that admission of this evidence did not result in a miscarriage of justice or constitute a substantial violation of a constitutional or statutory right. *Id.* at ¶ 10, 2 P.3d at 366.

■■■ ¶ 42 This Court has allowed evidence of other crimes or bad acts to be admitted under the "plan" exception of § 2404(B) where the methods of operation were so distinctive as to demonstrate a visible connection between the crimes. *Id.* at ¶ 12, 2 P.3d at 366–67. *See also Aylor v. State,* 1987 OK CR 190, ¶ 5, 742 P.2d 591, 593; *Driskell v. State,* 1983 OK CR 22, ¶ 23, 659 P.2d 343, 349; *Driver v. State,* 1981 OK CR 117, ¶ 5, 634 P.2d 760, 762–63. Distinctive methods of operation are also relevant to prove the identity of the perpetrator of the crime. *Eberhart v. State,* 1986 OK CR 160, ¶ 23, 727 P.2d 1374, 1379–80.

¶ 43 In this case, there is a substantial degree of similarity between the Marshall/Hoster assaults and the Fowler/Cutler homicides. The similarities show a visible connection sufficient to characterize a common scheme and to be probative on the issue of identity of the perpetrator. Briefly summarized, these similarities include: all four victims were white females over the age of 71 who lived alone; all four victims lived on the south side of the street and on corner lots; the back porch screen door was cut on the homes of three of the victims; the breaker box for the electricity to the residence was shut off in the homes of three of the four victims; entry to the residence was gained through a rear door in all four homes; a back door window was broken in three of the homes; two of the victims were awake when their homes was broken into and they were forced to their bedrooms; all four victims were raped vaginally while in their bedrooms; two of the four victims were also anally raped; all four victims were raped either late at night or in the early morning; all four victims were beaten about the head, face and arms; all four victims suffered vaginal tears and bleeding; a knotted rag was found on the beds of three of the victims; a pillow was placed over the faces of three of the victims during the assault; none of the residences occupied by the four victims were ransacked and nothing of any significant value was taken from any of the homes; all four assaults occurred within an eight month time period with the Fowler/Cutler crimes occurring four months apart and the Marshall/Hoster crimes occurring two months apart; all four victims lived within three miles of each other; Appellant lived with his mother or sister near the Fowler/Cutler homes at the time of their murders and he lived with his brother near the Marshall/Hoster homes at the time of their assaults.

¶ 44 Appellant contends there were just as many differences as there were similarities between the crimes. Chief among those differences is the fact that two of the victims were left alive while two were killed. Appellant argues that at the time these four crimes occurred, numerous instances of rapes and home invasions of elderly women were being reported in the media. Appellant asserts the crimes in this case were not unusual enough to point to a signature of one individual perpetrator. We disagree. The similarities in this case are far greater than those in *Hall v. State,* 1980 OK CR 64, ¶ 6, 615 P.2d at 1022 relied upon by Appellant (similarities limited to each rape took place in an automobile, all three victims were under the age of consent, and each rape was committed in Tulsa County). Further, the similarities between the Fowler/Cutler homicides and the Marshall/Hoster assaults show a method of operation so distinctive as to demonstrate a visible connection between the crimes. In

crimes involving sexual assaults, this Court has adopted a greater latitude rule for the admission of other crimes. *Myers,* 2000 OK CR 25, ¶¶ 21–24, 17 P.3d at 1030. *See also Driskell,* 659 P.2d at 349.[9]

¶ 45 We further uphold the trial court's ruling that the probative value of the evidence of the Marshall/Hoster assaults outweighed its prejudicial impact. *See Mayes v. State,* 1994 OK CR 44, ¶ 77, 887 P.2d 1288, 1309–10, *cert. denied,* 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995). The evidence was necessary to support the State's burden of proof despite its prejudicial nature. Finding the evidence properly admitted, this proposition is denied.

### FIRST STAGE JURY INSTRUCTIONS

¶ 46 In his fourth assignment of error, Appellant contends the trial court erred by instructing the jury on aiding and abetting. We review only for plain error as no objection was raised to the instruction. *Bland v. State,* 2000 OK CR 11, ¶ 49, 4 P.3d 702, 718, *cert. denied,* 531 U.S. 1099, 121 S.Ct. 832, 148 L.Ed.2d 714 (2001).

¶ 47 In support of his contention, Appellant relies on *Lambert v. State,* 1994 OK CR 79, 888 P.2d 494. In *Lambert,* the defendant was charged with malice aforethought murder. The trial court gave instructions on felony murder. The appellant argued he was not given sufficient notice of this theory in the information, and this Court reversed on this basis. 1994 OK CR 79, ¶¶ 45–48, 888 P.2d at 504. The situation in the present case is very different.

¶ 48 In a Fourth Amended Felony Information, filed approximately one year before trial, Appellant was charged with two counts of first degree malice aforethought murder for the deaths of Mrs. Fowler and Mrs. Cutler. In the alternative, he was charged with two counts of felony murder by aiding and abetting Robert Lee Miller, Jr., who in the commission of first degree burglary and first degree rape killed the victims. (O.R. 734–735). The State's theory throughout the proceedings was that Appellant committed the rapes, and that Appellant either killed the victims himself or he aided and abetted Miller in killing the victims. Unlike *Lambert,* Appellant was given plenty of notice concerning the State's alternative theories of guilt.

¶ 49 Further, the aiding and abetting instructions were warranted by the evidence. The State's evidence included the results of DNA testing showing Appellant was the donor of the semen found at the crime scenes, and that Miller had been excluded as the semen donor. The State also presented evidence showing Appellant had pled guilty to committing two other rapes under very similar circumstances as the charges on trial. During the cross-examination of several of the State's witnesses, the defense established that Miller had made certain statements about the Fowler/Cutler crimes which were not known to the general public, and that based in part upon those statements, Miller had been previously convicted of committing the Fowler/Cutler homicides. During re-direct examinations, the State elicited testimony that it was possible there were two intruders into the homes of Mrs. Fowler and Mrs. Cutler and that it was possible that one intruder killed the victims while the other

---

9. Even before *Myers,* this Court in *Driskell,* 659 P.2d at 349 cited to *Rhine v. State,* 1958 Ok CR 110, ¶ 20, 336 P.2d 913 (Okl.Cr.1958) and stated:

'That evidence of the commission of other similar crimes may be given to show the plan or design on the part of the defendant to commit such crimes has often been judicially recognized. The word 'design' implies a plan formed in the mind. That an individual who commits or attempts to commit abnormal sex offenses is likely to have such a mental 'plan' finds recognition in the fact that when a defendant is charged with the commission of sexual offense the law is more liberal in admitting as proof of his guilt evidence of similar sexual offenses committed by him than it is in admitting evidence of similar offenses when a defendant is charged with the commission of non-sexual crimes. . . .

'But where the prior rape or attempt is committed under circumstances remarkably similar to the one charged the evidence is admissible to show a plan or scheme to commit the crime in that fashion, even though the prior rape or attempt was committed on a person other than the prosecutrix. In such cases the evidence that defendant committed the prior offense tends to prove that he committed the offense charged.'

659 P.2d at 349.

watched. Additionally, during its case-in-chief, the defense introduced evidence concerning Miller's prior prosecution in the Fowler/Cutler cases. Accordingly, the trial court did not abuse its discretion in giving the instructions on aiding and abetting instructions. *See Cannon v. State*, 1995 OK CR 45, ¶ 25, 904 P.2d 89, 99. *See also Slaughter v. State*, 1997 OK CR 78, ¶ 63, 950 P.2d 839, 857 n. 9., *cert. denied*, 525 U.S. 886, 119 S.Ct. 199, 142 L.Ed.2d 163 (1998).

■ ¶ 50 Appellant further argues defense counsel was ineffective as counsel admitted guilt as to the felony murder charge without Appellant's consent. This Court follows the test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *See Bland*, 2000 OK CR 11, ¶ 112, 4 P.3d at 730. Under *Strickland's* two-part test, the appellant must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance by showing: [1] that trial counsel's performance was deficient; and [2] that he was prejudiced by the deficient performance. Unless the appellant makes both showings, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. Appellant must demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. *Id.* at 688–89, 104 S.Ct. at 2065. The burden rests with Appellant to show that there is a reasonable probability that, but for any unprofessional errors by counsel, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*, 466 U.S. at 698, 104 S.Ct. at 2070. When a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed. *Id.* at 697, 104 S.Ct. at 2069. This Court has stated the issue is whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his overall performance. *Bland*, 2000 OK CR 11, ¶ 112, 4 P.3d at 731.

¶ 51 Appellant relies on *Jackson v. State*, 2001 OK CR 37, ¶ 15, 41 P.3d 395, 398–399, where this Court reiterated its position that a concession of guilt does not amount to ineffective assistance of counsel, *per se*. The Court stated, "a complete concession of guilt is a serious strategic decision that must only be made after consulting with the client and after receiving the client's consent or acquiescence." *Id.* at ¶ 25, 41 P.3d at 400. This Court placed the burden on the appellant to show that he was not consulted and that he did not agree to or acquiesce in the concession strategy. *Id.*

¶ 52 Under the facts of the present case, and when all of the arguments are read in context, it is clear that guilt was not conceded. The defense was well aware from early on that the State had DNA evidence which conclusively placed Appellant at the scene. The defense filed numerous pre-trial motions challenging that evidence. To counter the State's evidence at trial, the defense showed that the scientific evidence relied upon 14 years ago to convict Robert Miller of the Fowler/Cutler crimes—hair and blood analysis—had since been proven unreliable. Defense counsel questioned whether DNA analysis might not also go the way of hair and blood analysis in light of future advances in forensic testing. Counsel also argued that all the State had to prove Appellant's guilt was DNA and that relying on DNA was like gambling and relying on mere probabilities. Defense counsel urged the jury not to let the State's experts decide the case for them. The defense also presented evidence showing Miller's involvement in the Fowler/Cutler crimes and his knowledge of details that only someone present at the crime scenes would have known. Defense counsel argued in closing argument that the evidence showed Miller wasn't a mere observer to the crimes, but the actual perpetrator of the crimes.

¶ 53 Defense counsel also challenged the State's alternative theories of guilt and argued the State could not assert that Miller was and was not the killer. Defense counsel argued that while Miller was in jail for the Fowler/Cutler crimes, other rape victims did not die. Defense counsel stated that when

the State told the jury they had no evidence Miller was the killer, "that cuts both ways because they also have no evidence what Ronald Lott was. None." Counsel then stated, "I don't know what you're going to do with that DNA, but at worst they have proven that Ronald Lott was the rapist …" Defense counsel further argued that merely because Miller was not included as a donor of the semen found at the scene, that did not mean that he was not a rapist and a killer. Counsel argued it merely showed Miller did not ejaculate at the scene. Counsel concluded his closing argument by asserting the State had not proven that Miller was not the killer, and because of that reasonable doubt as to Appellant's guilt existed.

¶ 54 In light of this record, counsel's statement that at worst "they have proven [Appellant] was the rapist" was not a concession of guilt to the charged crimes. This was an isolated comment within defense counsel's approximately 11 page closing argument. Any perceived conciliatory aspect of the remark was not prejudicial to Appellant. Claiming that Appellant had not been involved at all would have completely destroyed counsel's credibility before the jury in light of the strong evidence of guilt. *See Wood v. State*, 1998 OK CR 19, ¶ 60, 959 P.2d 1, 15–16. From the record, it appears that minimizing Appellant's role in the crimes in light of the DNA evidence was the best possible method to gain an acquittal on the charges. Accordingly, we do not find counsel's performance deficient under the circumstances. This assignment of error is denied.

 ¶ 55 In his eighth assignment of error, Appellant asserts the trial court erred in failing to give three uniform jury instructions which, according to the Notes on Use section following each instruction in the Oklahoma Uniform Jury Instructions (OUJI–CR), are required to be given in a homicide case. The three challenged instructions are: 1) the necessity for corroboration in homicide cases (OUJI–CR (2d) 9–14); 2) the definition of "in the commission of" (OUJI–CR (2d) 4–65); and 3) the definition of "sexual intercourse" (OUJI–CR (2d) 4–122). Appellant argues the failure to give each of these instructions lowered the State's burden of proof and re-

sulted in reversible error. A review of the record shows these instructions were not requested by the defense nor were defense objections raised to the absence of these instructions. Therefore, we review only for plain error. *Bland*, 2000 OK CR 11, ¶ 49, 4 P.3d at 719.

¶ 56 In *Phillips v. State*, 1999 OK CR 38, 989 P.2d 1017, *cert. denied*, 531 U.S. 837, 121 S.Ct. 97, 148 L.Ed.2d 56 (2000) we stated:

This Court stated in *Flores* the uniform jury instructions shall be used unless they do not accurately state the law. 896 P.2d at 560. "However, deviation from the uniform instructions does not require automatic reversal." *Id.* This Court reviews the instructions to determine whether the instruction at issue fairly and accurately states the applicable law. *Id.* "Even when error is committed, reversal is not required unless such error results in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right." *Id.* See also 20 O.S.1991, § 3001.1. Deviation from language of the uniform instructions constitutes technical error which is harmless if the instructions given fairly and accurately state the applicable law. *Smallwood v. State*, 763 P.2d 142, 144 (Okl.Cr.1988).

¶ 57, 989 P.2d at 1037–1038.

Appellant argues the court should have instructed the jury as follows:

No person may be convicted of (murder/manslaughter in the first/second degree) unless both the fact of the death of the person allegedly killed and the fact that his/her death was caused by the conduct of another person are established as independent facts and beyond a reasonable doubt.

(OUJI–CR (2d) 914).

 ¶ 58 The Notes on Use to this instruction provide that it is to be given in a homicide case; not every homicide case. Instructing the jury on the necessity for corroboration is required only in cases where a defendant has given a properly admitted extrajudicial confession. *See Fontenot v. State*, 1994 OK CR 42, ¶ 32, 881 P.2d 69, 80, n. 15.

¶ 59 Further, the jury was given the following in Instruction No. 4:

No person may be convicted of murder in the first degree unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:

*First,* the death of a human;

*Second,* the death was unlawful;

*Third,* the death was caused by the defendant;

*Fourth,* the death was caused with malice aforethought.

(O.R.1208) (OUJI–CR 4–61).

¶ 60 This instruction and Appellant's requested instruction both inform the jury the State must prove beyond a reasonable doubt the death of a human and that the defendant caused that death. Therefore, as the instruction given to the jury addresses the same principle of law as that included in the omitted instruction, we find no prejudice as a result of the omitted instruction.

■■ ¶ 61 Appellant next asserts the trial court should have instructed the jury as follows:

A person is in the commission of [forcible rape/[first-degree burglary] when he/she is (performing an act which is an inseparable part of)/(performing an act which is necessary in order to complete the course of conduct constituting)/(fleeing from the immediate scene of) a[forcible rape/[first-degree burglary).

(OUJI–CR (2d) 4–65).

¶ 62 The Notes on Use to this instruction provide that it should be given in every prosecution for first degree felony-murder. In Instruction No. 7, (OUJI–CR (2d) 4–64), the jury was given the elements of first degree felony-murder. The elements of the underlying offenses of first degree rape and first degree burglary are included in this instruction as well as the State's burden of proving each element beyond a reasonable doubt. While this instruction does not define the term "in the commission of", it adequately sets forth the law that no person may be convicted of felony-murder unless the death of a person was proven and that death was caused by the defendant while in the commission of first degree rape, which is defined as sexual intercourse with a person not the spouse of the defendant, where force or violence is used, or first degree burglary which is defined as the breaking and entering of a dwelling of another in which a human is present, with the intent to commit a crime. *See* 21 O.S. Supp.1998, §§ 701.7(B), 1111(A), 21 O.S.1991, § 1114, 21 O.S.1991, § 1431.

■■ ¶ 63 Finally, Appellant complains about the failure to give the following instruction:

Sexual intercourse is the actual penetration of the vagina/anus by the penis. Any sexual penetration, however slight, is sufficient to complete the crime of rape.

(OUJI–CR (2d) 4–122).

¶ 64 Appellant argues the failure to provide the jury with the above instruction created a reasonable likelihood that the jury failed to have a common understanding of the meaning of the element and that they applied the instructions to the facts in an unconstitutional manner. Appellant offers no support for this argument.

¶ 65 In *Johnston v. State,* 1983 OK CR 172, ¶¶ 20–21, 673 P.2d 844, 850, the trial court did not specifically instruct the jury that penetration was required for the crime of rape to occur. This Court held that as penetration was proven by ample uncontradicted evidence and the court defined rape as including sexual intercourse, a term commonly understood, an explicit definition of penetration was not an absolute necessity. *Id.*

¶ 66 In the present case, evidence of Appellant's DNA was found inside the vaginal vault of each elderly victim. Penetration was clearly proven. Further, first degree rape was defined in Instruction No. 7 as including sexual intercourse, which under the circumstances of this case, required no further definition.

¶ 67 Accordingly, we find that even in the absence of the instructions requested by Appellant on appeal, the jury was properly instructed on the applicable law of the case. Finding no plain error, this assignment of error is denied.

### ISSUES RELATING TO BOTH FIRST AND SECOND STAGES OF TRIAL

¶ 68 In his fifth assignment of error, Appellant argues that irrelevant and prejudicial character evidence of victim Zelma Cutler was improperly admitted. Appellant argues this evidence was introduced for no other reason than to invoke sympathy from the jury. As the State incorporated all of the first stage evidence into the second stage, Appellant asserts the improper character evidence denied him a fair trial and a fair sentencing.

¶ 69 Mrs. Cutler had no living immediate family at the time of Appellant's trial; therefore the State presented the testimony of Carol Sue Disney, a long time friend. Mrs. Disney testified that Mrs. Cutler had taken care of Mrs. Disney's mother when she was an infant, and that Mrs. Disney had frequented Mrs. Cutler's home while she was growing up. Mrs. Disney said that in later years she still visited Mrs. Cutler and did errands for her. Mrs. Disney testified that Mrs. Cutler lived alone, did not drive, and rarely left her home. She said Mrs. Cutler moved very slowly and had a cane she would use to help her walk by the end of the day. Mrs. Disney testified that Mrs. Cutler had a set daily routine, and went to bed soon after it got dark. She said Mrs. Cutler would leave a bathroom light on when she went to bed. She said Mrs. Cutler was very cautious when people came to her door and would not open the door more than a crack if it was a stranger. Mrs. Disney explained that at night Mrs. Cutler would not answer the door at all. Mrs. Disney testified that after Mrs. Fowler's murder, Mrs. Cutler told her she was afraid, and that she knew she was going to be next.

¶ 70 The State also introduced the testimony of Mary Akins, a postal service employee who delivered mail to Mrs. Cutler. Ms. Akins testified she checked on Mrs. Cutler as part of a "carrier alert program" in which the letter carriers check on elderly, handicapped or invalid people on their route. Ms. Akins testified that she would visit with Mrs. Cutler for a few minutes every day and then occasionally stop and have lunch with her. Ms.

Akins stated that Mrs. Cutler told her she had been friends with Mrs. Fowler, and that after Mrs. Fowler's murder, Mrs. Cutler was concerned that she would be next. The record reflects that defense counsel did not question Mrs. Disney or Ms. Akins, nor did counsel raise any objections to the witnesses' testimony. Therefore, we review Appellant's complaint for plain error only. *Romano v. State,* 1995 OK CR74, ¶ 18, 909 P.2d 92, 109, *cert denied,* 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996).

¶ 71 This evidence is admissible if it is relevant, and its probative value is not substantially outweighed by its prejudicial effect. 12 O.S.1981, §§ 2401, 2402, and 2403. Relevancy, of course, depends on the issues, which must be proven at trial. One of the issues at trial was the severability of the charges against Appellant for the murders of Mrs. Fowler and Mrs. Cutler. In support of the joinder of the charges in a single trial, the State argued the similarities of the two crimes showed a common scheme or plan by Appellant to rape and murder elderly women who lived alone. In Mrs. Fowler's case, family members testified that she was elderly and lived alone. In Mrs. Cutler's case, the testimony of Mrs. Disney and Ms. Akins provided that evidence which tended to show the circumstances of Mrs. Cutler's murder were so similar to those of Mrs. Fowler as to warrant combining the two offenses for one trial.

¶ 72 Further, the evidence supported the State's burden of proving guilt. Mrs. Disney's testimony concerning Mrs. Cutler's personal routines, when combined with physical evidence recovered from the scene of the murder, was probative in establishing that Mrs. Cutler's home had been forcefully entered, more than likely during the late night hours or early morning hours while she was asleep, and that she was physically incapable of fighting back against her assailant. The evidence was probative in showing that Appellant preyed on defenseless women who could not put up much resistance to him.

¶ 73 In addition to the testimony described above, Mrs. Disney also testified to Mrs. Cutler's generous hospitality towards

friends, how she taught Mrs. Disney's children to make paper birds out of scraps of paper, and that she had the "the sweetest smile" and was a "real sweet person." We find no trial issue that confers relevance to this evidence. However, any prejudice flowing from this evidence is so minimal, as to render its admission harmless beyond a reasonable doubt. *Hawkins v. State*, 1994 OK CR 83, ¶ 13, 891 P.2d 586, 593, *cert. denied*, 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995).

¶ 74 Further, Appellant asserts that Mrs. Disney's and Ms. Akins' testimony concerning Mrs. Cutler's statement that she would be killed next was improperly admitted hearsay. Title 12 O.S.1991, § 2803(3) provides an exception for the admission of hearsay statements, which reflect the victim's state of mind. However, such statements have been generally found admissible only when they show the victim's state of mind toward the defendant or to supply the motive for killing. *Welch v. State*, 2000 OK CR 8, ¶ 28, 2 P.3d at 370; *Washington v. State*, 1999 OK CR 22, ¶ 36, 989 P.2d 960, 973; *Cannon v. State*, 1998 OK CR 28, ¶ 23, 961 P.2d 838, 847; *Duvall v. State*, 1991 OK CR 64, ¶ 6, 825 P.2d 621, 626, *cert. denied*, 506 U.S. 878, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992). Here, Mrs. Cutler did not know Appellant nor had he actually threatened her. Therefore, her statement does not fall under the state of mind exception, and the statement should not have been admitted into evidence. However, this error is harmless as we find beyond a reasonable doubt that the error did not contribute to the verdict or sentence. *See Welch*, 2000 OK CR 8, ¶ 29, 2 P.3d at 370. Accordingly, this assignment of error is denied.

¶ 75 In his sixth assignment of error, Appellant asserts the trial court's failure to grant a mistrial in the first trial unless the defense stipulated to the chain of custody in the second trial forced him to sacrifice constitutional and statutory rights in exchange for his right to present a defense.

¶ 76 The record reflects that Appellant's defense in the first trial was that Joyce Gilchrist had contaminated the forensic evidence and therefore her results of the forensic testing were not reliable. During the presentation of the State's case-in-chief, it was discovered that there was forensic evidence that had never left the custody of the medical examiner's office and consequently had not been analyzed by Gilchrist or undergone DNA testing. The State sought a continuance in order to have the evidence analyzed. Over a defense objection, the trial court granted the continuance and ordered all materials and test results to be turned over to the defense.

¶ 77 Approximately one week later, the State informed the court the testing was complete and the results were inculpatory. The State announced it was ready to proceed with the trial. The defense argued the case should be dismissed due to discovery and notice violations. The trial court overruled the motion. Defense counsel next asked the evidence be suppressed. The trial court overruled the request. Finally, the defense requested a mistrial. This request was also overruled. The trial court noted a concern about the notice issue and indicated it would entertain a motion for a continuance. Defense counsel argued that a continuance would not be beneficial. After further discussions concerning resuming the trial, defense counsel argued the defense was so prejudiced by the new evidence that they intended to remain silent during the remainder of the State's first stage case and then demur to the evidence. Defense counsel explained to the court that its entire defense had been that Joyce Gilchrist had contaminated the evidence in this case therefore that evidence could not be relied upon for a conviction. Counsel argued that if the State was permitted to present to the jury results of DNA testing conducted by someone other than Gilchrist, and that testing showed that Appellant was the rapist, the only way to save Appellant's life would be to not alienate the jury further. Counsel argued that could be done only by standing moot during the remainder of first stage, demur to the first stage evidence, and then present a full defense in second stage.

¶ 78 After a recess was taken, the parties reconvened, out of the presence of the jury, and made the following record. Defense

counsel announced that he had discussed with the State the possibility of the State concurring in, or at least not objecting to, a motion for mistrial, "if we could come to an agreement on stipulations as to witnesses that they would have to call in a new trial." Defense counsel further indicated the State had prepared a proposed stipulation concerning the chain of custody of the forensic evidence, and the defense was prepared to agree to the stipulation. Defense counsel noted however, that their agreement to the stipulation would not preclude the defense from calling the witnesses themselves to testify.

¶ 79 The prosecutor agreed the stipulation was to the testimony regarding chain of custody, and not the truth of the matters included in the stipulation. The prosecutor agreed the defense retained the right to prove or disprove anything contained in the stipulation. Further, the prosecutor agreed with defense counsel's prior argument as to why Appellant could not receive a fair trial before the sitting jury. The trial court granted the motion for mistrial and reset the trial for December 3, 2001.

¶ 80 Appellant argues that under this record, the trial court indicated it would grant his motion for a mistrial only if the defense agreed to the State's conditions. Appellant further argues he was therefore forced to choose between his due process right to present a defense and his right to have the State prove its case beyond a reasonable doubt. We disagree.

¶ 81 There is nothing in the record that indicates the granting of the mistrial was based upon the defense's agreement to the State's conditions. The record reflects defense counsel sought a mistrial because he did not want to change the theory of defense mid-trial. A strategic agreement was reached between counsel concerning presentation of the evidence in the event of a new trial. The trial court did not mandate the stipulation, but merely approved the agreement reached between counsel. Further, the record shows Appellant did not give up any right to present a defense as the defense retained the right to call any witness they chose, despite the stipulation.

¶ 82 Appellant relies on *Simmons v. United States*, 390 U.S. 377, 393–94, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968) where the Supreme Court stated it was "intolerable that one constitutional right should have to be surrendered to assert another." *See also Williams v. State*, 1996 OK CR 16, ¶ 14, 915 P.2d 371, 377–378. Unlike *Simmons*, Appellant was not forced to choose between rights. Accordingly, this assignment of error is denied.

¶ 83 In his seventh assignment of error, Appellant contends the expert opinion testimony of Dr. Janet Rodgers, M.D., that Mrs. Cutler had been orally sodomized improperly invaded the province of the jury. While no defense objection was raised during Dr. Rodgers' testimony, the record shows a *Defense's Request for Daubert/Kumho Hearing Prior to the Admission of Certain State's Evidence* challenged the testimony of Dr. Rodgers. After hearing argument, the trial court overruled the request and found Dr. Rodgers' testimony admissible.

¶ 84 Dr. Rodgers testified as an expert witness in the area of sexual assault and sexual assault examinations. Dr. Rodgers stated she had reviewed materials from the victims' cases, including crime scene and autopsy photographs, autopsy reports, and results of DNA testing. Dr. Rodgers testified that in her opinion, Mrs. Cutler had been raped and orally sodomized. She stated her conclusion about the oral sodomy was based upon the discovery of a pillow at the scene that contained Mrs. Cutler's blood, semen, and a stain in the shape of a mouth print. The prosecutor inquired of Dr. Rodgers how she could reach such a conclusion when swabs taken from Mrs. Cutler's mouth did not show the presence of sperm. Dr. Rodgers explained that all of the sperm in Mrs. Cutler's mouth may have been transferred to the pillow or that the swab of her mouth was not performed correctly. Dr. Rodgers further testified that in forming her opinion that the rape was the result of non-consensual sex, she looked at evidence of the physical injuries suffered by Mrs. Cutler. Dr. Rodgers stated that evidence of bruises to Mrs. Cutler's mouth made her question whether the victim had also been orally sodomized.

Dr. Rodgers testified when she later learned of the pillow containing the blood and semen, she opined that it all fit with the conclusion that oral sodomy had occurred.

¶ 85 In *Romano v. State*, 1995 OK CR 74, ¶ 21, 909 P.2d at 109, we addressed the propriety of opinion evidence on ultimate issues and stated:

> Opinion evidence on ultimate issues is generally admissible. 12 O.S.1991, § 2704. However, the "otherwise admissible" language of § 2704 must be read in context with 12 O.S.1991, §§ 2403, 2701, 2702. While expert witnesses can suggest the inferences which jurors should draw from the application of specialized knowledge to the facts, opinion testimony which merely tells a jury what result to reach is inadmissible. (citations and footnotes omitted)

¶ 86 In the present case, Dr. Rodgers' testimony was not improper opinion testimony on an ultimate issue since it did not tell the jury what result to reach. Dr. Rodgers' testimony was based upon her examination of materials from the investigation into the rape/homicide coupled with her specialized training. At no time did Dr. Rodgers say that Appellant had raped or killed Mrs. Cutler; rather, she testified Mrs. Cutler's injuries were consistent with forcible rape based upon her specialized knowledge of sexual assaults. As this was proper opinion testimony, no error occurred in its admission.

¶ 87 Appellant further argues Dr. Rodgers' testimony was contrary to the evidence as the fluid or secretions on the pillow were not saliva but blood. Further, he argues there was no evidence that Mrs. Cutler's mouth had bled. A review of Dr. Rodgers' testimony shows she used the terms "secretions," "bodily fluid," and "blood" interchangeably when describing the stain on the pillow. She also stated that she did not know the results of the DNA testing on the pillow, but did know it contained blood and semen. Officer Goforth testified that when he responded to the scene at Mrs. Cutler's home, he observed blood around her mouth.

¶ 88 Appellant also challenges the description of the print on the pillow as mouth shaped calling it "speculation at best." A photograph of the pillow was admitted into evidence. Therefore, the jury could make its own determination of the shape of the print.

¶ 89 Finally, Appellant argues the evidence was inadmissible and highly prejudicial in the second stage as "oral sodomy in addition to forcible rape makes the charged crime significantly more aggravated and likely influenced the jury's decision to impose death." Dr. Rodgers' testimony was proper expert opinion. Further, the oral sodomy was part of the *res gestae* of the offense. Contrary to Appellant's argument, it is not the type of aggravating evidence that results in the arbitrary and capricious imposition of the death penalty that the Eighth Amendment forbids. *See Payne v. Tennessee*, 501 U.S. 808, 831, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In light of the aggravating evidence, evidence of the oral sodomy did not determine the sentence. Accordingly, this assignment of error is denied.

¶ 90 In his ninth assignment of error, Appellant complains that expert opinion testimony of Investigator Gerald McKenna that Appellant committed the murders in order to avoid arrest was improper as it invaded the province of the jury, was non-scientific, and was more prejudicial than probative. As no objection to the testimony was raised at trial, we review only for plain error. *Romano*, 1995 OK CR 74, ¶ 18, 909 P.2d at 109.

¶ 91 During the first stage of trial, Gerald McKenna, Sex Crimes Investigator for the Oklahoma City Police Department, testified that during the 23 years he had been a police officer, he had been assigned to the sex crimes unit for 12 years, and to the homicide unit for over one year. He testified to having attended and taught numerous courses and schools in the field of sex crimes investigation, and to having won 2 meritorious service awards for sex crimes investigations. McKenna also stated he had investigated hundreds of rapes and interrogated hundreds of potential rape suspects. He said he had testified many times in both state and federal court as an expert witness in the field of sex crime investigations.

¶ 92 Further, McKenna testified to the patterns and habits of serial rapists and compared the circumstances surroundings the rapes of Mrs. Fowler, Mrs. Cutler, Mrs. Marshall and Mrs. Hoster. McKenna also testified about sexually related homicides. He described them as falling into 2 types, "rape/murder" and "sexually motivated." McKenna said that in the "rape/murder" type, rape is the primary crime and the murder is secondary. One of the factors as to why the murder is secondary is elimination of a witness. McKenna was then asked whether he had an opinion as to whether the Fowler/Cutler crimes were of the first type or second type of sexually related homicide. McKenna testified he believed they were the first type, the "rape/murder" type, because of the need to eliminate a witness.

¶ 93 At the beginning of the second stage of trial, the court granted the State's request to incorporate all of the first stage evidence into the second stage. During the second stage closing argument, the prosecutor argued the evidence showed Appellant murdered the victims in order to eliminate them as witnesses against him. The prosecutor argued this evidence supported the aggravating circumstance that the murders were committed to avoid lawful arrest or prosecution.

¶ 94 Now on appeal, Appellant argues the subject of McKenna's testimony was not scientific, technical or otherwise specialized as required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Further, Appellant asserts McKenna's opinion that whoever killed the victims did so in order to eliminate witnesses was outside the bounds of his specialized knowledge.

¶ 95 In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–148, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238 (1999), the Supreme Court expanded *Daubert* and stated the subject of an expert's opinion testimony need not be limited to only "scientific" evidence, but may include "other specialized knowledge". Further, 12 O.S.2001, § 2702 provides, "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to deter-

mine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise." This Court has upheld the admissibility of expert opinion testimony concerning "specialized knowledge" as opposed to "scientific knowledge." *Torres v. State,* 1998 OK CR 40, ¶¶ 63–64, 962 P.2d 3, 21–22, *cert.denied,* 525 U.S. 1082, 119 S.Ct. 826, 142 L.Ed.2d 683 (1999) (*Daubert* not applicable to non-scientific evidence).

¶ 96 Further, the qualification of a person to testify as an expert is a matter which rests with the sound discretion of the trial court, and that decision will not be disturbed on appeal absent an abuse of that discretion. *Slaughter,* 1997 OK CR 78, ¶ 19, 950 P.2d at 848. An "abuse of discretion" has been defined as "clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented in support of and against the application." *Id.*

¶ 97 In the present case, McKenna's education and training in the field of sex crime investigation demonstrated sufficient specialized knowledge to qualify him to testify as an expert on the subject. His testimony certainly assisted the jury in understanding why some of the rape victims were killed while others were left alive. We find no abuse of the trial court's discretion in qualifying McKenna as an expert.

¶ 98 Further, McKenna's testimony that the crimes in this case fit into the "rape/murder" category of sexually related homicides because of the apparent need for the elimination of witnesses was relevant evidence of the killer's intent. The testimony was well within the bounds of McKenna's specialized knowledge. The testimony did not invade the province of the jury or improperly touch on an ultimate issue in the case nor did it direct the jury to find the aggravating circumstance of "avoid arrest." Rather, the testimony was proper expert opinion testimony based upon McKenna's years of investigation and analysis of sexually related homicides. *See Romano,* 1995 OK CR 74, ¶ 22, 909 P.2d at 110.

¶ 99 Nor do we find the evidence substantially more prejudicial than probative. McKenna's testimony was not the only evidence offered in support of the "avoid arrest" aggravator. Further, despite the guilty verdict returned against Appellant, the question of Robert Miller's involvement in the crimes was still an issue in the case and was addressed in the closing arguments of both the prosecution and the defense. And finally, the trial court instructed the jury that it was free to give the expert evidence whatever weight and credit it deemed proper. Accordingly, we find McKenna's expert opinion testimony was not determinative of the death sentence. For all of these reasons, this assignment of error is denied.

 ¶ 100 In a related assignment of error, proposition number eleven, Appellant argues the prosecutor injected facts not in evidence through the questioning of Inspector McKenna. Specifically, Appellant complains that through the questioning of McKenna, the State put Robert Miller's statements before the jury in order to prove that the homicides were committed for the purpose of avoiding arrest or prosecution, and to show that the victims begged for their lives and were orally sodomized. Appellant asserts McKenna's testimony concerning Miller's statements was inadmissible hearsay that influenced the first stage verdict. He argues the alleged error impacted the second stage, when combined with other second stage errors; it deprived him of a reliable sentencing stage.

¶ 101 Initially, we note that our review is for plain error only as none of the challenged testimony was met with contemporaneous defense objections. *Simpson v. State*, 1994 OK CR 40, ¶ 19, 876 P.2d 690, 698.

¶ 102 Inspector McKenna first testified to Robert Miller's involvement in the case on cross-examination. Defense counsel cross-examined McKenna extensively on statements made by Miller despite McKenna's acknowledgement that he never interviewed Miller and was not aware of the substance of Miller's statements. Defense counsel re-

peatedly reviewed statements made by Miller and asked McKenna his opinion as to whether or not the person making those statements would have been at the scene of the crime. This type of questioning continued on re-direct examination. McKenna testified his opinion that the case was a rape/murder done to silence a witness was consistent with the conclusion that Miller's statements indicated he was present at the scene or had some other way of learning what Appellant was thinking. However, Appellant does not cite, nor do we find in the record, that McKenna testified that based upon Miller's statements, the victim's begged for their lives and were orally sodomized.

 ¶ 103 Any error in McKenna's testimony concerning Miller's statements has been waived as defense counsel, and not the State, opened up the issue of Miller's statements with McKenna.[10] In fact, the State objected to the questioning during cross-examination for the reason that McKenna had not read all of Miller's statements. The trial court overruled the objection and permitted the questioning. This Court has repeatedly held that an appellant will not be permitted to profit by an alleged error that he or his counsel in the first instance invited by opening the subject or by his or her own conduct, and counsel for the defendant may not profit by whatever error was occasioned by the admission of such incompetent evidence. *Murphy v. State*, 2002 OK CR 24, ¶¶ 30-31, 47 P.3d 876, 882-882, *cert. denied*, 538 U.S. 985, 123 S.Ct. 1795, 155 L.Ed.2d 678 (2003); *Welch v. State*, 1998 OK CR 54, ¶ 10, 968 P.2d 1231, 1240; *cert. denied*, 528 U.S. 829, 120 S.Ct. 83, 145 L.Ed.2d 70 (1999); *Staggs v. State*, 1986 OK CR 88, ¶ 9, 719 P.2d 1297, 1299.

 ¶ 104 Further, Appellant asserts the State argued evidence in support of the "avoid arrest" aggravator as direct evidence of Appellant's intent. Appellant directs us to the following argument during the State's second stage closing. "Robert Miller. Robert Miller in his interview with David Shupe.

---

10. As the defense initiated and invited McKenna's testimony concerning Miller's statements, we find *Crawford v. Washington*, — U.S. —,

124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) is not implicated.

Why did he kill her? I don't know. Why did he kill her? He was scared. Scared of what? She was going to tell on him." Reviewing for plain error only, we find none.

¶ 105 The record shows that in support of the aggravator of "avoid arrest", the State presented Inspector McKenna's expert opinion that the murders were committed to eliminate witnesses. McKenna testified his opinion was not based upon any statements made by Robert Miller, but on his years of investigating hundreds of sexually related homicides. McKenna testified Miller's statement simply corroborated his opinion. The prosecutor's comments during closing argument were based on the evidence and did not deprive Appellant of a fair sentencing proceeding. *See Bland*, 2000 OK CR 11, ¶ 105, 4 P.3d at 729.

### SECOND STAGE ISSUES

■ ¶ 106 In his tenth assignment of error, Appellant contends the trial court erred in admitting the victim impact testimony of Cynthia Houston. Ms. Houston was the granddaughter of Mrs. Fowler. Appellant argues her testimony was inadmissible for the following reasons: 1) the testimony contained irrelevant evidence about the impact of the victim's death on non-immediate family members; 2) she testified as a family designee when family members had already testified; and 3) the testimony was highly prejudicial.

¶ 107 Prior to trial, Appellant objected to Ms. Houston's testimony on the same grounds now raised on appeal. In a *Cargle*[11] hearing during the second stage of trial, the court ruled that Ms. Houston did not qualify under the statute as a member of the victim's immediate family but could testify if designated as a family representative. The trial court limited her testimony to the effects of Mrs. Fowler's death on her father, her aunt, and her uncles.

■ ¶ 108 During the presentation of the victim impact evidence, Mrs. Fowler's son and daughter, Harold Fowler and Mary Templin, testified. Ms. Houston, having been designated the family representative by Harold Fowler, was the third and final victim impact witness. Reading from a prepared statement, Ms. Houston described how her grandmother was greatly loved by the family, that someone in the family visited her on a daily basis, and that her kitchen was a comfortable place for the family to congregate. Ms. Houston also testified to her grandmother's abilities in sewing and gardening. She described the "great impact" her grandmother's loss had on her father and his siblings. Ms. Houston concluded her testimony by stating her personal opinion that the appropriate punishment was death. No defense objections were raised during Ms. Houston's testimony therefore we review only for plain error. *Murphy v. State*, 2002 OK CR 24, ¶ 42, 47 P.3d at 884.[12]

■ ¶ 109 Victim impact evidence is constitutionally acceptable unless "it is so unduly prejudicial that it renders the trial fundamentally unfair . . . ." *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720, 735 (1991). In *Cargle*, 909 P.2d at 827–28, this Court addressed at length victim impact evidence as addressed by the Supreme Court and by our state statutes. Since that time we have had numerous occasions to revisit the statutory guidelines that control the content and use of victim impact evidence. However, Appellant's second challenge to Ms. Houston's testimony has not been specifically addressed by this Court in previous cases. The resolution of this challenge determines whether it is necessary to review his other objections to the testimony.

---

11. *Cargle v. State*, 1995 OK CR 77, 909 P.2d 806, *cert. denied*, 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996), *habeas corpus granted and remanded for a new trial on other grounds, Cargle v. Mullin*, 317 F.3d 1196 (2003).

12. The trial court's ruling on the admissibility of the victim impact evidence was similar to a ruling on a motion *in limine*, advisory only and not conclusive. *See Short v. State*, 1999 OK CR 15, ¶ 65, 980 P.2d 1081,1102–03, *cert. denied*, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (1999). To properly preserve the issue for appellate review, an objection must raised at the time the testimony is given. *Id.* Appellant's failure to object to Ms. Houston's testimony at the time it was offered, waives all but plain error.

¶ 110 Victim impact evidence is set forth in 22 O.S.2001, §§ 984, 984.1.[13] The manner in which victim impact evidence is to be presented and used at trial is set forth in § 984.1. This section provides in pertinent part, "each victim, **or** members of the immediate family of each victim **or** person designated by the victim or by family members of the victim, may present a written victim impact statement or appear personally at the sentence proceeding. . . . ." (emphasis added). This language limits the persons who may give victim impact evidence to three types of people: 1) the victim; 2) members of the victim's immediate family; or 3) a person designated by the victim or the victim's family. The listing in the disjunctive of the persons who may give victim impact evidence indicates the Legislature's intent to make these three categories of victim impact witnesses mutually exclusive. This restrictive view of who may give victim impact testimony is consistent with the limitations placed on victim impact evidence by the Legislature and by this Court. *See Cargle*, 1995 OK CR 77, ¶ 75, 909 P.2d at 828 ("victim impact evidence is intended to provide a quick glimpse of a victim's characteristics and the effect of the victim's death on survivors.")

¶ 111 The victim is usually the best person to testify to the effects of a crime perpetrated against him or her. In a homicide case when the victim cannot speak, family members are usually in the best position to give victim impact evidence. However, if family members choose not to take the witness stand or for any reason are unable to testify, they may designate another person to speak for them. The purpose behind a family designee is to give a voice to family members unable to testify in court. It was not intended to provide an opportunity for those family members not listed in the statute and other interested persons to give victim impact testimony.

¶ 112 Applying the statutory language to the present case, as Mrs. Fowler's son and daughter testified as members of her immediate family, it was not necessary to have a family designee or representative testify.[14] Therefore, it was error to allow Ms. Houston to testify as a family designee.[15]

¶ 113 However, having reviewed her testimony, we find nothing which "improperly weighted the scales" in the trial.[16] Ms.

---

13. 22 O.S.2001, § 984 provides in pertinent part:

1. "Victim impact statements" means information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, **or** person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence;
2. "Members of the immediate family" means the spouse, a child by birth or adoption, a stepchild, a parent, or a sibling of each victim; (emphasis added).

22 O.S.2001, § 984.1(A) provides:

A. Each victim, **or** members of the immediate family of each victim **or** person designated by the victim or by family members of the victim, may present a written victim impact statement or appear personally at the sentence proceeding and present the statements orally. Provided, however, if a victim **or** any member of the immediate family **or** person designated by the victim or by family members of a victim wishes to appear personally, such person shall have the absolute right to do so. (emphasis added).

14. In *Williams v. State*, 2001 OK CR 9, ¶ 66, 22 P.3d 702, 719, *cert. denied*, 534 U.S. 1092, 122

S.Ct. 836, 151 L.Ed.2d 716 (2002), this Court cited 22 O.S.Supp.1992, § 984.1 and stated that the Legislature had provided that any family member who wished to appear personally [to give victim impact evidence] shall have the absolute right to do so. This statement was in response to the appellant's argument that this Court should adopt a rule limiting the number of victim impact witnesses to one. This Court refused to adopt such a rule finding no statutory authorization for setting such limits on the number of witnesses. In that regard, the ruling in the present case is not intended to be a limitation of the number of victim impact witnesses. As long as a witness properly qualifies under the statute to give victim impact evidence, the number of witnesses the jury will hear is left to the sound discretion of the trial court.

15. Further, as a granddaughter Ms. Houston does not fall under the statutory definition of immediate family permitted to give victim impact evidence. This Court has not extended the statutory definition to include persons related to victims in ways other than those designated by the Legislature. *Hanson v. State*, 2003 OK CR 12, ¶ 28, 72 P.3d 40.

16. *See Payne*, 501 U.S. at 822, 111 S.Ct. at 2606–07;

Houston's testimony was brief and did not focus on the emotional aspects of the victim's death. Certain portions were cumulative to the testimony of her father and aunt.

¶ 114 Further, the jury was properly instructed, pursuant to OUJI–CR (2d) 9–45 on the use of victim impact evidence. Appellant had been convicted of raping and killing two elderly, defenseless women in their homes. Evidence of the aggravating circumstances was overwhelming and evidence of the aggravating circumstances clearly outweighs the mitigation evidence. Reviewing the entire record, we cannot say admission of Ms. Houston's testimony caused the verdict to be the result of an unreasonable emotional response. Accordingly, we find no plain error, and this assignment of error is denied.

¶ 115 In his twelfth assignment of error, Appellant challenges the evidence supporting the finding that the murders were committed for the purpose of avoiding lawful arrest or prosecution. To support a finding of this aggravating circumstance the State must prove the defendant killed in order to avoid arrest or prosecution. *Williams*, 2001 OK CR 9, ¶ 83, 22 P.3d at 723; *Mollett v. State*, 1997 OK CR 28, ¶ 49, 939 P.2d 1, 13, *cert. denied*, 522 U.S. 1079, 118 S.Ct. 859, 139 L.Ed.2d 758 (1998).[17]

¶ 116 The defendant's intent is critical to this proof and can be inferred from circumstantial evidence. *Williams*, at ¶ 83, 22 P.3d at 723. Furthermore, there must be a predicate crime, separate from the murder, for which the defendant seeks to avoid arrest or prosecution. *Id.* When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, the proper test is whether there was any competent evidence to support the State's charge that the aggravating circumstance existed. *Hain v. State*, 1996 OK CR 26, ¶ 62, 919 P.2d 1130, 1146, *cert. denied*, 519 U.S. 1031, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996). *See also Abshier*, 2001 OK CR 13, ¶¶ 156–157, 28 P.3d 579, 610, *cert. denied*, 535 U.S. 991, 122 S.Ct. 1548, 152 L.Ed.2d 472 (2002). In making this determi-

nation, this Court should view the evidence in the light most favorable to the State. *Hain*, at ¶ 62, 919 P.2d at 1146.

¶ 117 In the present case, the evidence showed Appellant subdued and raped both victims. While Appellant and the victims did not know one another, there is no indication Appellant attempted to hide his identity during the rape. That the victims could have identified their assailant if left alive is sufficient to support the conclusion that the victims were killed in order to prevent their identification of Appellant and his subsequent arrest and prosecution. *See Wackerly v. State*, 2000 OK CR 15, ¶ 43, 12 P.3d 1, 14–15, *cert. denied*, 532 U.S. 1028, 121 S.Ct. 1976, 149 L.Ed.2d 768 (2001); *Mollett*, 1997 OK CR 28, ¶ 49, 939 at 13, 939 P.2d 1.

¶ 118 Citing *Barnett v. State*, 1993 OK CR 26, 853 P.2d 226, Appellant further contends the rape was not a separate predicate crime arguing, "it is likely . . . the victims died during the rape as Appellant tried to subdue them, rather than Appellant completing the rapes and killing the victim before he left so that they would not tell." In *Barnett*, this Court found the "assault and battery was not separate and distinct from the murder itself, but rather was part of a continuing transaction which culminated in the death of the victim." 1993 OK CR 26, ¶ 30, 853 P.2d at 233–34.

¶ 119 The evidence in the present case shows the victims' deaths were not the result of the rape. Both victims died as a result of asphyxiation. The evidence at both crime scenes revealed numerous bruises on the victims' arms indicating they had been bound by the hands. Further, both victims suffered fractured ribs that Appellant concedes was consistent with the perpetrator having sat on the victim. However, the existence of pillows, and their condition, at both scenes supports the inference Appellant sat on the victims after the completion of the rape and smothered them. Reviewing this evidence in the light most favorable to the State, a rational jury could have found beyond a rea-

---

17. habeas corpus granted and case remanded for resentencing on other grounds, *Mollett v. Mullin*,

348 F.3d 902 (10th Cir.2003).

sonable doubt the rapes were distinct and separate crimes from the murders, and that Appellant killed the victims in order to avoid lawful arrest or prosecution.

 ¶ 120 In his fourteenth assignment of error, Appellant contends that *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) mandates that the aggravating circumstances alleged in a capital prosecution must be charged in an information and proven at preliminary hearing. This argument has been previously rejected in *Primeaux v. State*, 2004 OK CR 16, ¶¶ 14–16, 88 P.3d 893, where this Court found *Ring* is not as broad as the appellant argued. *Ring* does not contain any language requiring state courts to provide capital defendants with a preliminary hearing on alleged aggravating circumstances.

¶ 121 Title 21 O.S.2001, § 701.10 does not require any type of pre-trial hearing regarding the validity of the State's aggravating circumstances; its provisions are satisfied if evidence in aggravation is made known to the defendant prior to trial. *Newsted v. State*, 1986 OK CR 82, ¶¶ 10–11, 720 P.2d 734, 738–739, *cert. denied*, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).

¶ 122 In the present case, Appellant concedes he was informed of the aggravating circumstances in his case pursuant to state law. *Ring* does not change the procedure in Oklahoma. *Primeaux v. State*, 2004 OK CR 16, ¶ 16, 88 P.3d at 896. As Appellant has failed to show any conflict between our state law and rulings from the United States Supreme Court, his request for a new sentencing proceeding is denied. Accordingly, this assignment of error is denied.

 ¶ 123 In his thirteenth assignment of error, Appellant contends he was denied a fair sentencing by prosecutorial misconduct. Appellant directs us to the cross-examination of defense witness Jason Ledford, Detention Officer at the Oklahoma County Jail. Appellant argues that in his questioning of Officer Ledford, the prosecutor presented his own testimony concerning the advantages Appellant would receive if the jury afforded him a life sentence. Appellant asserts this tactic is akin to the prohibited practice of comparing

the plight of the victim to the advantages of a live defendant in prison. Appellant argues the prosecutor's remarks were calculated to persuade the jury to impose death on the grounds that Appellant would have a luxurious life in prison if given a life sentence. Additionally, Appellant asserts the prosecutor implied, based on facts not in evidence, that the only reason Appellant was a good inmate was because he stood the chance of getting out of prison some day.

¶ 124 Officer Ledford testified he had known Appellant for 2–3 years while Appellant had been an inmate in the Oklahoma County Jail. Officer Ledford stated Appellant was housed in an "honor pod" at the jail. Ledford testified he had contact with Appellant at least once a month, whenever he conducted his regular "shake down" of cells. Ledford said he had never had any personal or business conflicts with Appellant so that Appellant had to be sent to a segregation pod, nor had he seen any violent tendencies from Appellant. On redirect, defense counsel asked the witness how quickly an inmate discharged a sentence of life without parole.

¶ 125 On recross-examination, the prosecution asked the witness to describe the differences in the county jail and the state penitentiary. Specifically, the prosecutor asked Ledford if he remembered Appellant's testimony given at a May 2000 speedy trial hearing regarding the differences between the county jail and the penitentiary in regards to his opportunities for regular exercise, contact family visits, and participation in programs to learn a skill. The prosecutor asked Ledford if he remembered Appellant testifying that inmates serving sentences of life without parole got out of their cells for a large portion of the day and had access to weapons. It was not until the conclusion of Ledford's testimony that defense counsel objected and moved for a mistrial on the grounds of improper questioning by the prosecutor by the intent to raise societal alarm "going into things about discharging sentences." The trial court overruled the objection.

¶ 126 Initially, our review is for plain error only. This Court remains committed to the general rule that a timely objection must be made on the record to preserve any alleged

error for appellate review. *Short*, 1999 OK CR 15, ¶ 65, 980 P.2d at 1103. A timely objection brings the alleged error to the attention of the trial court and provides an opportunity to correct the error at trial. *Id.* Appellant's objection at the close of the witnesses' testimony was not timely.

¶ 127 The extent of cross-examination rests in the discretion of the trial court and reversal is only warranted where there is an abuse of discretion resulting in prejudice to the defendant. *Parker v. State*, 1996 OK CR 19, ¶ 13, 917 P.2d 980, 984, *cert. denied*, 519 U.S. 1096, 117 S.Ct. 777, 136 L.Ed.2d 721 (1997). As a general rule, any matter is a proper subject of cross examination which is responsive to testimony given on direct examination or which is material or relevant thereto and which tends to elucidate, modify, explain, contradict or rebut testimony given in chief by the witness. *Smith v. State*, 1985 OK CR 17, ¶ 14, 695 P.2d 864, 868. When a defendant opens up a field of inquiry on direct examination, he may not complain of subsequent cross-examination of the same subject. *Ashinsky v. State*, 1989 OK CR 59, ¶ 15, 780 P.2d 201, 206.

¶ 128 A review of the record shows that prior to the testimony of Officer Ledford, the defense presented testimony from Charles Harris, Tag Supervisor for the Oklahoma Correctional Industries at RBD Connors Correctional Facility. Mr. Harris stated that Appellant worked for him in the tag facility while incarcerated in the penitentiary. Mr. Harris also testified to the policies and practices at the penitentiary that allowed an inmate to work at the tag facility. He specifically testified to Appellant's performance and demeanor at the tag facility. Harris said he had never witnessed any violent behavior from Appellant. This testimony, and Officer Ledford's direct examination testimony, put Appellant's character and conduct while incarcerated at issue and thus enabled the State to cover this same subject during cross examination. *See Walker v. State*, 1994 OK CR 66, ¶ 42, 887 P.2d 301, 314–315, *cert. denied*, 516 U.S. 859, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995).

¶ 129 The State was entitled to introduce evidence of bad character by showing that Appellant was not truly non-violent but merely knew what it took to get a placement outside of the prison walls. The prosecutor's questions to Ledford were leading questions. However, 12 O.S.2001, § 2611(D) states that the use of leading questions during cross-examination is ordinarily permissible. *See Frederick v. State*, 1983 OK CR 114, ¶ 13, 667 P.2d 988, 992.

¶ 130 Appellant's comparison to the prohibited argument of comparing the plight of the victim to the advantages of a defendant in prison is not applicable. The State did not mention or argue Appellant should not be sentenced to life in prison while the victims were dead. Further, the record does not support Appellant's claim the prosecutor's remarks were calculated to persuade the jury to impose death on the grounds that Appellant would have a luxurious life in prison if given a life sentence. The prosecutor's questions to Ledford were relevant in contradicting Appellant's evidence that he was non-violent and in supporting the alleged "continuing threat" aggravator.

¶ 131 Relying on *Le v. State*, 1997 OK CR 55, 947 P.2d 535, *cert. denied*, 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998) Appellant argues that State's contention, that it is unfair for Appellant to live since the victims are dead, creates a super-aggravator applicable in every death case. This Court found that no amount of mitigating evidence can counter such an argument, and if the jury agrees they may not even consider mitigating evidence. *Id.* at ¶ 53, 947 P.2d at 554–555. The Court in *Le* found that while the prosecutor's arguments were error, the appellant had not shown the jury failed to consider the mitigating evidence in his case as evidenced by the fact the jury failed to find one of the charged aggravating circumstances. *Id.*

¶ 132 In the present case, Appellant has failed to show the prosecutor's conduct caused the jury to fail to consider the mitigating evidence. The jury was appropriately instructed as to the mitigating evidence and was not in any way precluded from considering any and all mitigating evidence. In fact,

the jury rejected the "continuing threat" aggravator.

¶ 133 Accordingly, we find the prosecutor's conduct did not cause the jury to impose a sentence not supported by the evidence. *See Bland,* 2000 OK CR 11, ¶ 106, 4 P.3d at 728. Finding no plain error, this assignment of error is denied.

## INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

¶ 134 In his fifteenth assignment of error, Appellant contends he was denied the effective assistance of counsel by counsel's failure to present any evidence regarding Appellant's background in the second stage of trial. Appellant asserts that abundant information was available to defense counsel, but counsel did not investigate the information sufficiently to make it presentable to the jury. Appellant argues much information existed about his background that could have reduced his moral culpability and humanize him to the jury. Appellant asserts this claim of error is almost exclusively based on facts outside of the appellate record; therefore his claim of error is raised fully in his *Application for an Evidentiary on Sixth Amendment Claims* filed concurrently with his appellate brief.

¶ 135 Rule 3.11(B)(3)(b), *Rules of the Court of Criminal Appeals,* 22 O.S.2001, Ch. 18, App. allows an appellant to request an evidentiary hearing when it is alleged on appeal that trial counsel was ineffective for failing to "utilize available evidence which could have been made available during the course of trial....". Once an application has been properly submitted along with supporting affidavits, this Court reviews the application to see if it contains "sufficient evidence to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." Rule 3.11(B)(3)(b)(i). *See Short,* 1999 OK CR 15, ¶ 93, 980 P.2d at 1108.

¶ 136 In order to meet the "clear and convincing" standard set forth above, Appellant must present this Court with evidence, not speculation, second guesses or innuendo. This requirement of setting forth evidence does not include requests for more time to develop and investigate information that was readily available during trial preparation. Under the provisions of Rule 3.11, an appellant is afforded a procedure to have included in the record for review on appeal evidence which was known by trial counsel but not used or evidence which was available but not discovered by counsel. It is not a procedure for post-trial discovery. With these standards in mind, we review Appellant's Application for Evidentiary Hearing on Sixth Amendment Grounds.

¶ 137 Appellant first repeats an argument raised in Proposition IV of his appellate brief, that defense counsel was ineffective for admitting guilt as to the felony murder charge without Appellant's consent.[18] In support of his claim, Appellant offers his own sworn affidavit, attached to the application as Exhibit A, wherein he states that his attorneys never discussed with him their intention to concede his guilt, that he was surprised when they conceded his guilt, and that he did not want them to concede his guilt.

¶ 138 Appellant's affidavit is inconsistent with the record. As discussed in Proposition IV, the record does not reflect that counsel

---

**18.** The factual basis for this claim is entirely within the appellate record. Therefore, it should have been raised and argued in the appellate brief. Particularly, allegations of ineffective assistance of trial counsel are to be raised within the appellate brief, supported by citation to legal authority and parts of the appellate record. The failure to raise in an appellate brief an issue within the appellate record waives its consideration. *See* Rule 3.5(A)(5) and (C)(6), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2001). *See also Neill v. State,* 943 P.2d 145, 146 (Okl.Cr.1997). The failure to raise an issue within the appellate record not only denies the State the opportunity of responding to the allegation, but also gives the impression of an attempt to violate the page limits set for briefs in capital cases. *See* Rule 9.3(A), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2001). In contrast, a Rule 3.11 hearing is reserved for issues outside of the appellate record. *See* Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2001). In the future, the failure to fully raise and support by authority in the brief in chief those issues contained within the appellate record will constitute waiver of those issues on appeal.

conceded guilt. Appellant has taken one comment out of context and turned it into a concession of guilt. Appellant's allegation, and his supporting affidavit are not sufficient to show by clear and convincing evidence there is a strong possibility trial counsel was ineffective.

¶ 139 Appellant next contends trial counsel was ineffective for failing to adequately investigate and present mitigating evidence. He argues trial counsel failed to competently advise him of the meaning and availability of mitigating evidence. Appellant asserts that trial counsels' failure to consult with him and obtain his consent not to offer evidence of his background in second stage was not the product of deliberate trial strategy, but rather the result of failure to fully investigate mitigation.

¶ 140 In Appellant's Exhibit B, Gretchen Mosley, appellate counsel, admits in her sworn affidavit that a mitigation investigation was conducted in preparation for trial. She states that investigation included interviewing Appellant (which she did herself) and his family members regarding his childhood, family history, substance abuse, significant relationships and life events, psychological and social development, and life circumstances and events surrounding the time of the crimes. Ms. Mosley also states intelligence and psychological testing was done, as well as an evaluation by a neuropsychologist for brain damage. A Risk Assessment was also conducted by licensed psychologist, Dr. Jeanne Russell, Ed.D.

¶ 141 Ms. Mosley states that none of this information was presented to the jury. She states that when she asked trial counsel why he had not presented any evidence of Appellant's background, trial counsel responded, "that they had 'no way to put it on.' "

¶ 142 Appellant now argues that the mitigation investigation should have put trial counsel on notice that Appellant's background would be a significant mitigating factor at trial, and therefore, trial counsel should have retained an appropriate expert to conduct a social history of Appellant. Appellant asserts trial counsel should at least have presented the Risk Assessment Report prepared by Dr. Jeanne Russell.

¶ 143 In support of his argument, Appellant presents the affidavit of appellate counsel; a Social History report prepared by Dr. Jeanne Russell, Ed.D., licensed psychologist, at the request of appellate counsel (Appellant's Exhibit C); a Risk Assessment prepared by Dr. Jeanne Russell at the request of trial counsel (Appellant's Exhibit I); a copy of an internal memo from the Oklahoma Indigent Defense System (OIDS) mitigation investigation stating that co-counsel received more information from Appellant about his childhood and family, and that lead counsel decided not to use the additional information, but go with what evidence they had at the time (Appellant's Exhibit D); and affidavits from Sid Conaway and Paula Alfred, capital defense attorneys in the Tulsa County Public Defender's Office, stating in pertinent part, it is the practice of capital attorneys in Oklahoma to retain a mental health/sociology expert to prepare and present to the jurors the client's background (Appellant's Exhibits E and F).

¶ 144 To support his burden of establishing that trial counsels' failings were not the result of reasonable trial strategy, Appellant presents his own affidavit (Appellant's Exhibit A) stating that counsel never discussed with him their strategy of not investigating or presenting mitigation regarding his background; a copy of an OIDS internal memo prepared by trial counsel after Appellant's trial concerning the decision not to impeach state's witness Brian Wraxall (Appellant's Exhibit G); and a copy of an OIDS internal memo (apparently from a mitigation investigator to lead counsel) suggesting a change of counsel to an African–American attorney from Oklahoma County based upon certain concerns of Appellant's family (Appellant's Exhibit H).

¶ 145 Appellant has provided a great deal of information in his Application and accompanying affidavits. However, we find he has failed to set forth sufficient evidence to warrant an evidentiary hearing. The affidavits submitted by Appellant show a substantial mitigation investigation was conducted in this case. However, Appellant finds fault with trial counsels' failure to conduct a further

investigation. Appellant asserts trial counsel should have requested "expert forensic mental health assistance to explain the importance of Appellant's experiences to his development and commission of the crimes" and presented this to the jury in the form of a Social History Report. Indeed, in Oral Argument, appellate counsel argued the information contained in the Social History was the only information that could have saved Appellant's life and that trial counsel had an obligation to put that information before the jury. For the reasons discussed below, we find Appellant has failed to show by clear and convincing evidence that trial counsels' failure to present a Social History Report of Appellant to the jury warrants an evidentiary hearing.

¶ 146 As part of the mitigation investigation, a Risk Assessment Report was prepared. In Appellant's Exhibit I, Dr. Russell stated that Appellant was referred by defense counsel for evaluation of his potential risk of future violent behavior. Dr. Russell stated her assessment was based upon interviews with Appellant, jail staff, and OIDS Investigator Leedy; and review of transcripts from preliminary hearings in Appellant's prior convictions; records from the Department of Institutions, Social and Rehabilitative Services (DISRS) and Department of Corrections (DOC), and results of intelligence and psychological tests.

¶ 147 In her assessment, Dr. Russell set forth the reasons for Appellant's incarceration, his family history, education, substance abuse history, psychiatric history, medical history, relationships, employment, and criminal history. Additionally, the assessment contains Dr. Russell's observations on Appellant's behavior and mental status. She stated he is "guarded in his responses to interview questions", but shows "no symptoms of a major mental disorder such as hallucinations or delusions". Also included in the Risk Assessment are Assessment Results and Appellant's aggression history. In the Assessment Results portion of the report, Dr. Russell stated Appellant scored high for the presence of psychopathy, which she explained was "characterized interpersonally by grandiose, egocentric, manipulative, and deviant interactions", and "by a lack of empathy, guilt or remorse". She also stated psychopathy was defined "behaviorally in terms of impulsivity and sensation seeking". Also included in the Assessment Results were Dr. Russell's statements of Appellant's Personality Factors. She stated there was "no evidence of psychotic thinking or other symptoms related to a major mental illness". Instead, "test results indicated Appellant was self-centered or absorbed and may have difficulty in delaying gratification". She said his "behavior vacillated from agreeable to accusatory and this type of behavior often keeps others on edge never knowing if he will react in an obliging or resentful manner". She also stated, "many of his legal difficulties were most likely the product of these attributes coupled with a chronic substance abuse problem. Results further suggest he has not developed internal controls and as a result functions best in a controlled, structured environment such as a prison until such control is developed."

¶ 148 As for the Aggression History portion of the report, Dr. Russell noted Appellant's two prior convictions for violent rapes against elderly women. She stated, "he offered few insights into motive behind victim selection". Dr. Russell also stated that a review of DOC records "revealed 11 misconducts over a 10 year time period none of which included physical aggression."

¶ 149 In the Summary section of the Report, Dr. Russell stated that an evaluation of potential risk to others was conducted for the purpose of assessing continuing threat. She stated risk was assessed for both community and prison settings. Dr. Russell noted Appellant had been incarcerated for 14 of his 41 years. She said Appellant reported drinking alcohol on a daily basis since he was 15 years old. He also reported some use of marijuana but denied use of other drugs. Dr. Russell concluded that Appellant's risk to others in the community should be considered high as he lacks internal controls, has access to alcohol, and his acts of aggression have always occurred in the community and involved elderly women. Dr. Russell also concluded that Appellant's risk to others in a prison setting should be considered low based in

part on the structure of the prison system. She also stated, "since incarceration for the most part minimizes the defendant's access to alcohol, drugs, weapons and potential victims, the risk for future aggression significantly decreases when placed in a more secure setting".

¶ 150 At the request of appellate counsel, Dr. Russell also conducted a Social History of Appellant. In Appellant's Exhibit C, Dr. Russell explained that a Social History is to assess the impact of both psychological and sociological factors on Appellant's offense. She also stated it differs from the Risk Assessment performed previously as the Social History looks at historical factors to better understand behavior while the risk assessment "focuses on the interaction of the environment and personality traits in assessing the probability for future aggression."

¶ 151 A comparison of the reports show, that but for one exception, the same sources were relied upon for information. The one exception, "interviews with family members and friends", is listed as a resource on the Social History Report but not the Risk Assessment Report. Consequently, Appellant's family history and childhood is set forth in greater detail in the Social History. However, as Appellant and family members were interviewed as part of the mitigation investigation, trial counsel was presumably aware of the information provided by family members. Further, many of the conclusions set forth in the Social History Report are the same as those set forth in the Risk Assessment Report.[19] While recognizing the different purposes behind the Social History and the Risk Assessment, the two reports in this case contained much of the same information. Therefore, when we consider the information gathered from the mitigation investigation and known to trial counsel, we find Appellant has failed to show by clear and convincing evidence there is a strong possibility trial

counsel was ineffective for failing to expand his investigation to include a social history of Appellant.

¶ 152 Next, we turn to the presentation of mitigation evidence. Defense counsel presented five witnesses during second stage: Charles Harris, Tag Supervisor for the Oklahoma Correctional Industries at RBD Connors Correctional Facility, and Jason Ledford and Terry Williams, Detention Officers at the Oklahoma County Jail. Each of these witnesses testified to Appellant's conduct and behavior while incarcerated. Harris testified that Appellant was a good worker in the tag facility and has risen to a position where he assisted Harris in overseeing the operation. Harris described Appellant as dependable, and said if Appellant were sent back to him in the tag facility; he would have no problem working with him. Harris said he never saw Appellant exhibit any aggressive or violent behavior. Ledford and Williams both testified that they had not seen any violent behavior or had any problems with Appellant while he was incarcerated in the Oklahoma County Jail.

¶ 153 Also presented was Harriett Tingle, Appellant's niece. Ms. Tingle testified she was only eight years younger than Appellant and that he was more like a big brother to her than an uncle. In addition to detailing prior experiences with Appellant, she stated that while Appellant was incarcerated, she stayed in contact with him. Ms. Tingle testified that no matter what sentence Appellant received, she and his family would continue to support him. The final defense witness was Jim Fowler, Mrs. Fowler's son. Mr. Fowler testified generally against the death penalty.

¶ 154 Trial counsel's decision to limit the mitigating evidence to the above witnesses appears to have been reasonable trial strate-

---

**19.** In the Risk Assessment, Dr. Russell stated Appellant "tries to present himself in a favorable light which may be due to a combination of denial and lack of self-awareness." In the Social History she states Appellant "employs denial and repression to deal with psychological pain." Both the Risk Assessment and Social History note the early onset and long-lasting use of alcohol by Appellant. Both reports also note the lack of internal controls on Appellant's part. Both reports conclude that in the absence of any external controls, either the Oklahoma Children's Center where Appellant was admitted as a delinquent child or the adult prison system, combined with the lack of internal personal controls, Appellant engages in a pattern of daily drinking, use of drugs and criminal activity.

gy. Presenting witnesses who would testify to Appellant being a productive member of prison society was consistent with information contained in the Risk Assessment that the risk of future aggression from Appellant significantly decreased when he was in a secure prison environment.

¶ 155 Further, Ms. Tingle was the only family member who testified although she stated she had been accompanied to trial by an uncle and his girlfriend, her grandmother (Appellant's mother), an aunt and a cousin. There is no indication in the record or in Appellant's *Application for Evidentiary Hearing* why those relatives did not testify at trial.

¶ 156 Therefore, it comes down to counsel's failure to present evidence of Appellant's life history and the circumstances surrounding the crimes as contained in the Social History. Looking at both the Risk Assessment Report and the Social History Report it was reasonable trial strategy not to put too much of Appellant's life history before the jury. For every witness the defense presents, the State has the opportunity to cross-examine. While Appellant argues that presenting evidence of his life history and an explanation of his conduct in light of his psychological and social development would have enabled the jury to see him as a person and not as a monster, the evidence could have the opposite impact on the jury. Both the Risk Assessment and Social History contain information unflattering to Appellant. Presenting detailed evidence concerning the behavioral impact of Appellant's life history of having no external or internal controls (except when incarcerated) combined with chronic substance abuse "could reasonably be viewed as mitigating to one person and aggravating to another." *Murphy*, 2002 OK CR 24, ¶ 54, 47 P.3d at 886.

¶ 157 Information contained in the Social History which could arguably be seen as mitigating evidence consisted of descriptions of Appellant's father as "unloving" and "a strict disciplinarian" who regularly "whipped" his children and spent his salary on his own needs instead of feeding his family; that Appellant was the youngest of 10 children and his mother had a difficult pregnancy with him; the family lived in a small home with only five rooms and no running water; his parent's separation when he was young and his accompanying his mother, and his young siblings, to live in the city where his mother "worked all the time in an effort to take care of the family and eventually 'kick[ed] him out of the house for getting in trouble'"; Appellant's placement in the Oklahoma Children's Center as a delinquent child when he was 16; and psychological testing which reported Appellant was "anxiously troubled, lonely and socially apprehensive most of the time" and that "he often turns to alcohol to fulfill a number of otherwise difficult to achieve psychological functions".

¶ 158 Dr. Russell stated in part the Social History was to provide a background for understanding why Appellant eventually aggressed against older women in such a violent and abusive way. She concluded that although he had a positive relationship with his mother, her decision to leave his father and move from the country to the city was "the single most devastating event in his life." Dr. Russell also noted a relationship Appellant had with a woman named Donna Burton. Burton apparently gave birth to a daughter during their relationship although the paternity of the child was in question. After the relationship between Burton and Appellant ended, Appellant continued to provide for the child. Dr. Russell noted the relationship ended in 1984 or 1985, about the time the first of the rapes occurred. Dr. Russell claimed the relationship with Burton provided additional insight into how Appellant dealt with abandonment and may have been the catalyst for his aggression.

¶ 159 By contrast, information in the Social History which could be described as not mitigating includes Dr. Russell's statement that Appellant had a very different view of the way he was raised and "glamoriz[ed]" his early years, his description of his relationship with his father as "close", his reported memory lapse concerning his move to the city with his mother and that Appellant's descriptions of his early life was inconsistent with that of other family members and DISRS records. The Social History lists Appellant's seven prior convictions from two different

states ranging from conspiracy to sell marijuana to first degree rape and robbery with firearms and that Appellant has been in prison since 1987. Also included in the Social History is information concerning Appellant's alcohol and substance abuse which could be seen in either a mitigating or non-mitigating light. This is a brief, and admittedly incomplete synopsis of the Social History, which Appellant argues defense counsel was ineffective in failing to present.

¶ 160 Having reviewed the information in the Social History, we find presentation of that evidence would not have been helpful to Appellant and might even have been counterproductive. If in fact, Dr. Russell had been put on the witness stand to testify to the Social History, the topic of the Risk Assessment and the information and conclusions therein would have been relevant information for the State to address on cross-examination. In that scenario, the jury would certainly have heard that Appellant was a chronic alcohol and drug abuser, he was self absorbed, lacked empathy, guilt and remorse and without warning exhibited wide mood swings which affected his interaction with others. The jury might also have heard that Appellant's conduct could not be explained or excused due to a major mental illness or psychotic thinking, as there was no evidence he suffered from either condition. Further, Appellant has received 11 misconduct reports while incarcerated the past 10 years. Although none of the incidents included physical aggression, they did include verbal aggression toward staff.[20]

¶ 161 Instead of taking the risk that cross-examination could reveal such "negative" information that would harm Appellant's chances for a sentence less than death, counsel chose to focus on more "positive" evidence of Appellant's life in prison. This evidence showed that while Appellant was incarcerated he was not violent or aggressive, that he was a good worker and had proved himself sufficiently responsible to work at making license tags and to oversee other inmates in the tag facility. We find trial counsel's choice to limit the second stage evidence to that showing Appellant was a productive member of prison society and he had family who loved him, while excluding potentially damaging evidence of Appellant's psychological and social development, especially in light of his history of aggression towards elderly women, was reasonable trial strategy well within the range of professional reasonable judgment. In fact, counsel would have been ineffective if the door to the damaging Risk Assessment Report and evidence contained therein had been opened and the State had been able to exploit it to their advantage. The Social History in this case contained the "double edge" the Supreme Court has found sufficient to justify limited investigations. *See Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). We find it sufficient to justify a limited presentation of evidence.

¶ 162 Defense counsel in this case consisted of a team of four attorneys well known to this Court to be experienced in both the prosecution and defense of capital cases. Having reviewed the contents of the Social History, trial counsel's response to appellate counsel that the Social History was not presented because there was "no way to put it on" can be interpreted as saying the evidence could not be "safely" presented to the jury, not that it couldn't be put on at all. The record shows a reasoned strategic decision, made after a reasonably thorough investigation, not to present the Social History because it would have opened the floodgates to evidence very harmful to Appellant. Even with the evidence contained in the Social History, the State's evidence in aggravation was great in this case, while the mitigating evidence was much weaker.

¶ 163 Appellate counsel argued at oral argument that negative information

---

**20.** Having compared the Risk Assessment and the Social History, and finding much of the information contained in the two reports to be similar, we take this opportunity to note that when read in their entirety, the two reports paint a much different picture of Appellant. While recognizing the differing purposes behind the two reports, Appellant comes across as a much meaner more violent person in the Risk Assessment than in the Social History. We note this distinction as a way to caution expert witnesses not to attempt to deceive the courts by intentionally leaving out information that could be relevant to a jury's consideration.

about Appellant was already before the jury in that he had been convicted of committing admittedly horrific crimes. Appellate counsel argued that trial counsel had an obligation to present additional facts and psychological factors to explain Appellant's conduct. To the contrary, counsel does not have an obligation to introduce any and all evidence that might conceivably be considered mitigating in the hope that it might outweigh the aggravating evidence and save the defendant's life. Counsel's obligation is to use reasonable professional judgment in making decisions concerning the defendant's case.[21]

¶ 164 This is not to say that counsel is to make all of the decisions in the case. As I stated in my special concurrence to *Grant v. State*, 2004 OK CR 24, 95 P.3d 178, (Lumpkin, J. special concur), it is the (competent) client's case, not the lawyer's. While, counsel has the responsibility to advise, inform, and consult with the client, the defendant has the right be involved in the decision process that will affect his or her life. *Id.,citing Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

¶ 165 In the present case, there is no indication that during trial, Appellant disagreed with counsel's decision to limit the presentation of mitigating evidence. Further, the record reflects no question as to Appellant's competency for trial. The record shows that counsel's decision was a strategic choice made after a thorough investigation and within the exercise of reasonable professional judgment. Accordingly, we find presentation of the Social History would not have significantly influenced "the jury's appraisal" of Appellant's moral culpability. *Cf. Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 2544, 156 L.Ed.2d 471 (2003) *quoting Williams v. Taylor*, 529 U.S. 362, 398, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

¶ 166 Accordingly, having thoroughly reviewed Appellant's *Application* and accompa-

nying affidavits, we find he has failed to show by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to investigate further and utilize the complained-of evidence. We decline to grant Appellant's application for an evidentiary hearing on sixth amendment grounds.

## ACCUMULATION OF ERROR CLAIM

¶ 167 In his sixteenth assignment of error, Appellant contends the aggregate impact of the errors in this case warrants reversal of his convictions and at the very least modification of his death sentence. This Court has repeatedly held that a cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. *Bland*, 2000 OK CR 11, ¶ 132, 4 P.3d at 734. Having found no errors warranting reversal or modification, we find relief is not warranted upon a cumulative error argument. This assignment of error is denied.

¶ 168 In his seventeenth and final assignment of error, Appellant asks this Court to reconsider error raised in other cases, but denied. Specifically, Appellant refers us to the following argument previously raised and denied: 1) unconstitutionality of death penalty; 2) unconstitutionality of "especially heinous atrocious or cruel" aggravating circumstance; 3) unconstitutionality of "continuing threat" aggravator; 4) unconstitutionality of "avoid lawful arrest" aggravating circumstance; and 5) unconstitutionality of victim impact evidence. Appellant provides no accompanying argument but states the issues are raised specifically for purposes of preservation in the event this Court departs from precedent during Appellant's appeal process.

¶ 169 We find Appellant has not properly preserved these issues for appellate

---

21. Further, counsel does not have an obligation to get a waiver from the defendant on the decision not to present certain mitigating evidence. While this Court has held that when a competent defendant intends to completely forego the presentation of any mitigating evidence during second stage, counsel must obtain a knowing waiver to that effect, *Wallace v. State*, 1997 OK CR 18,

¶ 27, 935 P.2d 366, 376, we have not extended the need for a waiver to a case where some mitigation evidence is offered. Therefore, contrary to Appellant's claim, counsel was not obligated to obtain a written waiver from Appellant concerning the decision to limit presentation of his background in second stage.

review. Rule 3.5(A)(5), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2003) requires an appellate brief to state "an argument, containing the contentions of the appellant, which sets forth all assignment of error, supported by citations to the authorities, statutes and parts of the record." Appellant's listing of previously denied claims and citation to cases where those claims were denied, without argument as to the applicability of that claim to Appellant's case, is insufficient to preserve the issue for appellate review. This Court has consistently held that we will not review allegations of error that are neither supported in the record or by legal authority. *Armstrong v. State*, 1991 OK CR 34, ¶ 24, 811 P.2d 593, 599; *Wolfenbarger v. State*, 1985 OK CR 143, 710 P.2d 114, 116, *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986). As we stated in *Templer v. State*, 1972 OK CR 68, 494 P.2d 667:

> ... we should also like to refer the defendant to *Bell v. State*, Okl.Cr., 381 P.2d 167 (1962), wherein we stated:
>
> 'It has never been the practice of this court to permit the inclusion of arguments in former cases by reference, and we do not propose to recognize such herein. There is no end to the mischief and research that would be imposed on appellate courts if this practice were permitted.'

1972 OK CR 68, ¶ 22, 494 P.2d at 671.

¶ 170 Accordingly, Appellant has waived appellate review of the issues. *But see Frederick v. State*, 2001 OK CR 34, ¶¶ 173–174, 37 P.3d 908, 952 (wherein this Court declined to find whether list of issues previously decided by the Court adversely to appellant's position properly preserved issues for appellate review, Court denied relief on basis that appellant failed to cite any controlling authority or demonstrate any other reason for this Court to reconsider or alter its position on any of the foregoing issues). Accordingly, this assignment of error is denied.

### MANDATORY SENTENCE REVIEW

■■■ ¶ 171 Pursuant to 21 O.S.2001, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.2001, § 701.12. Turning to the second portion of this mandate, the jury found in each count the existence of two (2) aggravating circumstances: 1) the murder was especially heinous, atrocious, or cruel; and 2) the murder was committed for the purpose of avoiding lawful arrest or prosecution. 21 O.S.2001, § 701.12(4)(5). We have previously found in this opinion, the evidence was sufficient to support the "avoid lawful arrest" aggravator.

■■■ ¶ 172 To support a finding that the murder was especially heinous, atrocious, or cruel requires proof that the death was preceded by torture or serious physical abuse. *Phillips*, 1999 OK CR 38 ¶ 80, 989 P.2d at 1039. This includes evidence that shows the infliction of either great physical anguish or extreme mental cruelty. *Id.* After making the above determination, the attitude of the killer and the pitiless nature of the crime can also be considered. *Id.*

¶ 173 The evidence in the present case shows that in two separate instances, Appellant unexpectedly attacked an elderly woman in her home. The evidence in Mrs. Fowler's case showed some resistance on her part, and her eventual capitulation. The evidence showed that both victims were physically abused during the assault and rapes and as a result suffered injuries that would have been painful. Each victim surely suffered great mental anguish as she were suffocated by Appellant bearing down on a pillow covering her face.

¶ 174 Considering the unprovoked manner of the killings in the present case; the conscious suffering of the victims, both physically and emotionally; the attitude of the killer as evidenced by Appellant's attacks upon victims who could not adequately defend themselves, we find, construing the evidence in the light most favorable to the state, the jury's finding of the heinous, atrocious or cruel aggravator was supported by sufficient evidence.

¶ 175 Having found the aggravators supported by sufficient evidence, we turn to the

mitigating evidence. Appellant presented as mitigation witnesses his niece, two jailers from the Oklahoma County Jail, and a detention officer from the Department of Corrections. These witnesses testified that Appellant has adapted well to incarceration and has demonstrated over the past 15 years that he is not a threat while incarcerated, he has a family who loves and cares for him, Appellant has taken advantage of educational and vocational opportunities while incarcerated, Appellant was housed in an honor pod at the Oklahoma County Jail, and Appellant has worked while incarcerated in the penitentiary and county jail. Appellant also presented the testimony of Jim Fowler, Mrs. Fowler's son, who testified generally that Appellant should not receive the death penalty. This evidence was summarized into six (6) factors and submitted to the jury for their consideration as mitigating evidence, as well as any other circumstances the jury might find existing or mitigating.

¶ 176 Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we find the sentence of death to be factually substantiated and appropriate as to both Counts I and II. The record shows the jury rejected the alleged aggravating circumstance of "continuing threat." Under the record before this Court, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.2001, § 701.13(C), in finding that the aggravating circumstances outweighed the mitigating evidence. Accordingly, finding no error warranting reversal or modification, the **JUDGMENTS** and **SENTENCES** for First Degree Murder are **AFFIRMED** and the **APPLICATION FOR EVIDENTIARY HEARING ON SIXTH AMENDMENT CLAIMS IS DENIED.**

JOHNSON, P.J. and LILE, V.P.J.: concur.

CHAPEL, J. and STRUBHAR, J.: concur in result.

¶ *177 Appendix*

**Findings of Fact and Conclusion of Law**

Now on this 2nd day of June 2000, this matter comes up for ruling on the Defendant's Motion to Dismiss for Lack of Speedy Trial. The Court having previously heard evidence on this matter on May 26, 2000. The State of Oklahoma appears by Richard Wintory, and the defendant appears by his attorney Craig D. Corgan. The Court hereby finds as follows:

1. On May 22, 2000, defendant's trial for the murder of Anna Fowler and Zelma Cutler was scheduled to begin before this Court. The trial date was stricken at the request of the defendant in order for the defendant to produce evidence in support of his Motion to Dismiss.

2. The Court and the State could have tried this case in May or June of 2000 but at the request of the defendant, the proceedings were stayed to allow the defendant to litigate his speedy trial issue.

3. The defendant wants a speedy trial and an appeal and thereby objected to this Court setting the case for trial on Monday, June 5 of 2000.

4. On May 26, 2000, this Court heard evidence presented by the defendant and the State. The matter was continued to June 2, 2000, pending the ruling of this Court.

5. Anna Fowler, (approximately age 83) was found dead in her home in Oklahoma City on September 3, 1986. Zelma Cutler, (approximately age 90) was found dead in her home across the street from Mrs. Fowler's residence on January 11, 1987. Evidence of semen found at both crime scenes and in the victim's bodies indicated both victims had been raped before being murdered.

6. The defendant, Ronald Lott ("defendant"), is charged with the rapes and murders of both Anna Fowler and Zelma Cutler.

7. On May 12, 1988, the co-defendant, Robert Lee Miller, Jr., was convicted of the rapes and murders of Mrs. Fowler and Mrs. Cutler. At the same time, defendant Ronald Lott had not yet been identified as a perpetrator.

8. Subsequent DNA testing initiated by Robert Lee Miller, Jr., exonerated him as being the source of the semen samples found inside the bodies of Mrs. Fowler and Mrs. Cutler and at the same time inculpated Ronald Lott who was already serving time for the rape of two other elderly females ("the 1987 rapes").

9. The Court of Criminal Appeals reversed and remanded the case on Robert Lee Miller, Jr. as a result of the new DNA evidence.

10. The State filed charges on Ronald Lott on March 10, 1995, and subsequently dismissed the charges on January 30, 1996 pending further investigation.

11. The State refiled the charges against Ronald Lott in this case in 1997 while the defendant was still being held by the Department of Corrections for the 1987 rapes.

12. On September 9, 1997, defendant Lott's preliminary hearing in this case was set on November 3, 1997.

13. On November 3, 1997 the preliminary hearing began. Further evidence was presented over the course of the following dates:

December 18, 1997

December 19, 1997

January 30, 1998

February 13, 1998

March 20, 1998

14. Based on the complicated nature of this case as well as the number of witnesses called the State, the preliminary hearing was not concluded until March 30, 1998. However, at no time during the course of the hearing did the defendant raise an objection to the lengthy nature of hearing.

15. Defendant discharged his sentence for the 1987 rapes in February 1998 during the preliminary hearing proceedings on the present case.

16. On March 20, 1998, at the conclusion of the State's case, the Honorable Judge Charles Humble bound the defendant over for trial. At the conclusion of the hearing, defendant Lott requested immediate receipt of the preliminary hearing transcripts at public expense. Counsel for the defendant stated on the record that he wanted the transcripts in order to prepare certain motions to be filed. (See Preliminary Hearing Transcript March 20, 1998, Pg. 105–106.) Judge Humble advised counsel of the proper procedure to be followed to obtain the transcript. The case was then set for pre-trial before Judge Charles Owens on May 1, 1998.

17. Despite being told at the conclusion of the preliminary hearing how to do so, defense counsel did not request the transcripts until July 15, 1998.

18. On May 1, 1998 the pre-trial was continued by agreement of parties to August 26, 1998 to allow for the preliminary transcripts to be completed. While defendant's current counsel asserts such transcripts were not vital to the Court's rulings on the defendant's motions, this Court finds that defendant's attorney at the time was reasonable and prudent in believing the Court would have considered the evidence offered at preliminary hearing to be relevant to the Court's proceedings.

19. On August 26, 1998, the pre-trial hearing was continued to October 27, 1998 to again allow for the preliminary hearing transcripts to be completed. The final transcript from the preliminary hearing was completed and filed with the Court Clerk on September 21, 1998.

20. On October 27, 1998 the pre-trial was continued to November 30, 1998 and then to February 1, 1999 as Judge Charles Owens was retiring from the bench. Judge Owens chose not to hear the pre-trial motions since he would not be the presiding Judge of the trial.

21. There is no record that the defendant requested a trial date while this case was pending before Judge Charles Owens.

22. Based on Sherry Mighton's testimony, this Court finds that Judge Charles Owens docket was such that he could not have tried a case of this magnitude between October 1998 and his retirement in January of 1999.

23. On February 1, 1999 both parties, including the defendant, appeared before

Judge Susan Bragg who had taken over Judge Charles Owens docket. Judge Bragg informed both parties that she could not preside over this case because she had worked on it while employed as an Assistant District Attorney. The case was then re-assigned to the undersigned judge and the pre-trial was set for March 1, 1999.

24. On March 1, 1999, the pre-trial was continued to March 18, 1999 and then to March 31, 1999. One of the continuances was due to Joe Robertson, counsel for the defendant, not appearing for the motion hearing.

25. On March 31, 1999 both parties appeared before this Court. The State appeared by Richard Wintory and Greg Masburn and the Defendant appeared by his attorney Joe Robertson. Although this Court has no independent recollection of ruling on the defendant's pre-trial motions on said date, the paperwork held by the State indicated the language and ruling of this Court would have made regarding said motions.

26. To this date three different attorneys from the Oklahoma Indigent Defense System have represented the defendant since the preliminary hearing began. These attorneys are Silas Lyman, Joe Robertson and Craig Corgan.

27. The State has only requested two continuances in this case. The first continuance on September 28, 1999 was requested to allow the State to submit hair sample for new type of DNA testing (Mitochondrial Testing) not previously available to either party. Such evidence results could be either inculpatory or exculpatory in nature and therefore necessary evidence to be presented at trial. The trial was rescheduled to begin on March 27, 2000.

28. The second continuance requested by the State was on February 15, 2000, after being notified by LabCorp. of its inability to procure sufficient DNA result for the hair samples sent to them in October of 1999. Additional hair samples were then sent to LabCorp. on February 9, 2000. On February 17, 2000, the Court moved the trial two weeks from March 27, 2000 to April 10, 2000.

29. On March 10, 2000, a three judge panel continued the case to May 22, 2000 because of docket scheduling conflicts of the attorneys for both the State and the defendant.

30. Judges Black, Caswell, and Gray met and scheduled major cases involving the same lawyers. The matter was rescheduled for March 27, 2000.

31. The only two objections to continuance filed by the defendant were in response to the State's second motion for continuance dated February 16, 2000 and the objection to the scheduling continuance to March 27, 2000.

32. Article 2, § 6 of the Constitution requires that justice be administered without delay and forbids any *unreasonable* delays by the State.

33. The two requested delays caused by the State in this case were not unreasonable, but in fact were reasonable and prudent actions taken by the State in order to provide possible exculpatory evidence to the defense.

34. Any delay in this case is a result of due diligence on the part of the State and the defense to get the information they need to try this case and present the evidence of the case.

35. All of the cases cited by the defendant in support of his motion to dismiss are easily distinguishable from the facts in the case at bar.

36. Specifically, in *Pickle v. Bliss*, 418 P.2d 69 (1966), the Court found that the delay was due to laches on the part of the State. There is no evidence of laches on the part of the State in this case.

37. In *Green v. Oklahoma*, 713 P.2d 1032 (1985), all of the time frames that are involved are pre-accusation and do not apply to the right to speedy jury trial.

38. In *State ex. rel. Trusty v. Graham*, 1974 OK CR 146, 525 P.2d 1231, there was a showing of prejudice to the defense and the prosecution did not show any legal cause for the delay. In the instant case there has been no showing of prejudice to

the defendant and the State has shown cause for the delay.

39. The defendant cites three forms of prejudice as a result of the delays in this case: 1) not being able to have contact visits with his family as he did while he was in the custody of the Department of Correction; 2) not having the benefit of cross-examination of Janice Davis because she is now deceased; 3) the State has been able to strengthen it's case since the conclusion of the preliminary hearing due to advances in technology.

40. There is no prejudice to the defendant in regards to his visitation rights with his family. The defendant admits that his family had not been to se him during the last year he was in the custody of the Department of Corrections.

41. There is no prejudice to the defendant resulting from the death of Janice Davis, caused by any delay attributable to the State. Ms. Davis was deceased prior to the defendant being identified as a perpetrator in this case; therefore Ms. Davis was not available to testify on the day or at any time subsequent to the discovery of the defendant's involvement in this case.

42. There is no prejudice to the defendant even though the testing of forensic evidence in the present case proved favorable to the State. Such testing could have benefited the defendant had it been exculpatory in nature.

43. The pre-trial testing of forensic evidence based on the discovery of anew and more accurate testing procedure prevents the necessity of such testing during appeal to determine whether a new trial is warranted.

44. This Court's trial dockets consists of fourteen murder cases and over 800 felony cases that make it difficult to schedule a case of this magnitude within five months of the defendant requesting a trial date.

IT IS THEREFORE the ruling of the court that the Defendant's Motion to Dismiss for Lack of a Speedy Trial is overruled and the trial is hereby reset to November 6, 2000 at the request of the Defendant.

(O.R.539–544) (emphasis in original).